**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

DR. MOSHE GLICK,

Plaintiff,

**Civil Action No.**

v.

ESSEX COUNTY PROSECUTOR'S OFFICE;
TOWNSHIP OF WEST ORANGE;
DETECTIVE BRYAN LOUIS;
LIEUTENANT BRADLEY SQUIRES;
ASSISTANT PROSECUTOR LOGAN TEISCH;
DEPUTY CHIEF ASSISTANT PROSECUTOR CELESTE MONTESINO;
CHIEF MATTHEW FEULA;
FORMER CHIEF OF POLICE JAMES ABBOTT;
LIEUTENANT WILFRED JIROUX;
LIEUTENANT RORY KEARNS;
CAPTAIN MICHAEL O'DONNELL;
OFFICER VINCENT TORRISI;
OFFICER JOSEPH TUTELA;
DETECTIVE LIEUTENANT WILLIAM SAYERS;
SERGEANT SEBASTIAN DELEON;
JOHN DOES 1–25 (WOPD/ECPO employees);

Defendants.

---

# PLAINTIFF'S COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, by and through counsel, and hereby alleges:

## INTRODUCTION

1. This action arises from: (a) the West Orange Police Department's and its supervisors' disregard of advance notice of organized threats to a Jewish religious event held on the grounds of a synagogue and on-scene inaction that

allowed dozens of aggressive and unpermitted protestors to penetrate and trespass upon synagogue property, attack congregants, and intimidate worshippers from exercising their religious freedoms; (b) the subsequent investigative and charging decisions that treated as the criminal aggressor Plaintiff, a Doctor who intervened to stop what he reasonably perceived as a life-threatening chokehold on a fellow worshipper; (c) the continued prosecution and legal-process restraints imposed on Plaintiff without probable cause despite readily available exculpatory video evidence; (d) the deliberate obstruction of police internal affairs investigations and improper interference with internal affairs accountability; (e) the circling of the wagons by prosecutors, involving retaliatory prosecution, reprisals against Dr. Glick for exercise of his constitutionally protected First Amendment rights during his prosecution, and multiple knowingly improper OPRA denials; and (f) the continued prosecution of Dr. Glick after he received a full and complete pardon of all criminal charges.

2. Plaintiff's criminal case, ginned up against him by a conflicted and intentionally inept police department and an off-the-rails prosecutor's office, terminated without a conviction, satisfying favorable termination for Fourth Amendment malicious prosecution under 42 U.S.C. § 1983.

3. As used in this Complaint, the "Mob" means the group of approximately one hundred fifty anti-Israel protestors who, on the evening of November 13, 2024, assembled without a permit at the intersection of Ellis Street and Forest Avenue in West Orange—many of them masked and carrying vuvuzelas and air horns—in response to social-media calls by the Party for Socialism and Liberation–New Jersey ("PSL"), American Muslims for Palestine–New Jersey ("AMP"), Pal-Awda NY/NJ, Teaneck for Palestine, the NJ Anti-Zionist Minyan, and others; marched to Congregation Ohr Torah while harassing visibly Jewish pedestrians along the way; pushed through the police line; and invaded synagogue property during a Jewish religious event, where its members intimidated, assaulted, and threatened the congregants.

4. Members of the Mob included, among others, Altaf Sharif ("Sharif"), Eric Camins ("Camins"), Tova Fry a/k/a Terry Kay ("Fry"), Matthew P. Dragon ("Dragon"), and others referred to herein as "Jane Doe" and "John Doe."

5. Dragon acted as a marshal of the Mob and as its point of contact with the On-Scene Police Officers. At the same time, Dragon was a member—and, upon information and belief, the Deputy Director—of the West Orange Community Emergency Response Team ("CERT"), a Township volunteer emergency response unit operating under the West Orange Fire Department, and was

personally known to the on-scene supervisor, Defendant Bradley Squires, through that role.

## JURISDICTION AND VENUE

6. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States including 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and 42 U.S.C. § 1986.
7. The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367, including claims under the NJCRA, N.J. Stat. Ann. § 10:6-2, and NJLAD, N.J. Stat. Ann. § 10:5-1 to -50.
8. Venue is proper under 28 U.S.C. § 1391 because the events occurred in Essex County, New Jersey.

## PARTIES

9. Plaintiff Dr. Moshe Glick is a resident of West Orange, New Jersey.
10. Defendant Essex County Prosecutor's Office ("ECPO") prosecuted Plaintiff's case and exercised supervisory authority over relevant investigative functions and line prosecutors.
11. Defendant Township of West Orange is a New Jersey municipal entity.
12. The West Orange Police Department ("WOPD") is the Township's police department, through which the Township provides police services; WOPD's acts and omissions are those of the Township.

13. Defendant James Abbott was, at all relevant times, the Chief of Police of the West Orange Police Department (and the Township's Interim Business Administrator) and the final decisionmaker with respect to charging decisions arising out of the November 13, 2024 incident. As Chief, Defendant Abbott exercised ultimate authority over operational policing plans, the framing of the incident, the investigation, and the decision to charge Plaintiff, notwithstanding the availability of exculpatory evidence.

14. Defendant Matthew Feula—WOPD's Deputy Chief at the time of the November 13, 2024 events and now its Chief of Police—was, at all relevant times, a senior WOPD policymaker and/or final decisionmaker for operational policing plans for events such as the synagogue gathering.

15. Defendant Lieutenant Bradley Squires (a Sergeant at the time of the November 13, 2024 events) was the on-scene supervisor with WOPD and exercised supervisory authority over the on-scene police response.

16. Defendant Detective Bryan Louis was a WOPD detective responsible for investigative steps and evidence-handling relevant to charges brought against Plaintiff.

17. Lieutenant Rory Kearns was a WOPD lieutenant responsible for investigative steps and supervision relevant to charges brought against Plaintiff.

18. Defendant WOPD Officer Vincent Torrisi prepared and submitted an incident/investigation report and participated in the initial framing of the incident.

19. Defendant WOPD Officer Joseph Tutela participated in the on-scene police response and/or post-incident interactions and was referenced as part of the police narrative.

20. Defendant WOPD Lieutenant Wilfred Jiroux supervised officers, reviewed and approved the initial report(s) and investigative narrative, and bore responsibility for ensuring the adequacy and neutrality of the investigation.

21. Supervising Officer Lt. Jiroux, On-Scene Commander Sgt. Squires, P/O Tutela, and P/O Torrisi were on-scene when the Mob descended upon the synagogue, and will be described jointly herein as the "On-Scene Police Officers." All were with the WOPD at all relevant times.

22. Defendant William Sayers—then a WOPD Detective Lieutenant and Internal Affairs Unit Commander, and now a Captain in WOPD's Office of Professional Development & Responsibility—was an Internal Affairs supervisor who suspended or blocked internal affairs processing of Plaintiff's complaints and refused or limited statement-taking.

23. Defendant WOPD Sergeant Sebastian DeLeon participated in Internal Affairs communications and assisted in refusing to take Plaintiff's recorded statements and/or in deferring internal affairs actions.

24. Defendant Captain Michael O'Donnell was, at all relevant times, a senior WOPD professional standards/OPR official with responsibility for internal affairs processes. Defendant O'Donnell participated in efforts to deter, delay, or constrain internal affairs accountability. In addition, Defendant O'Donnell colluded with Essex County Prosecutor's Office Internal Affairs personnel to illegally suspend Plaintiff's internal affairs complaints against several West Orange Police Officers.

25. Defendant Assistant Prosecutor Logan Teisch was the line prosecutor responsible for interactions with WOPD on evidence and for prosecutorial decisions and communications relevant to Plaintiff's prosecution.

26. Defendant Celeste Montesino was, at all relevant times, a Deputy Chief Assistant Prosecutor in the Essex County Prosecutor's Office with supervisory authority over Assistant Prosecutor Logan Teisch and over charging and disposition decisions in Plaintiff's case. Teisch submitted his proposed charges against Plaintiff to Montesino for review before they issued, and after Teisch was shown the exculpatory video and indicated that he would

recommend dismissal, Montesino, upon information and belief, directed or approved the continued prosecution of Plaintiff.

27. John Does 1–25 are unknown WOPD/ECPO personnel whose acts/omissions will be substituted by amendment.

28. All defendants were aware of or should have been aware of the specific danger of violence the members of the Mob posed for the Plaintiff and other Jews and had a duty to protect the Plaintiff.

29. All complained-of actions were done wantonly, maliciously, intentionally, knowingly, purposely, purposefully, deliberately, recklessly, and with deliberate indifference and reckless disregard.

30. All defendants are being sued in their individual and official capacities and all acted at all times under color of state law and in violation of Plaintiff's clearly established rights and clearly established law.

## STATEMENT OF FACTS

### I. The Planned Religious Event, Advance Threats, and Prior Notice to Police (November 4–12, 2024)

31. Plaintiff Dr. Moshe Glick is Jewish and, at all relevant times, resided in West Orange, New Jersey. In the fall of 2024, Glick and others organized with his local synagogue, Congregation Ohr Torah, and other synagogues, a religious event centered on the biblical Jewish obligation to live in the Land of Israel. The event was originally scheduled for November 13, 2024, in a room

designated for communal prayer and study containing a Jewish library of prayer books and sacred texts at Glick's private home in West Orange, NJ, where Glick had hosted numerous prayer groups; the event included prayer, a religious memorial service for the late Rabbi Avi Goldberg, a Bible sermon, religious songs with biblical verses, educational programming on the biblical obligation to live in the Land of Israel, and a real estate fair to purchase a home in Israel.

32. The event that had been planned for Glick's private home—including prayer, a religious memorial service for the late Rabbi Avi Goldberg, a Torah sermon, religious songs with biblical verses, educational programming on the religious obligation to live in Israel, and a real estate fair—was relocated to Congregation Ohr Torah. Due to the additional space available at the synagogue, the organizers also added prayerful dancing and a festive religious meal. All of these activities formed part of the congregants' religious observance.

33. However, Glick and the event's other organizers were sensitive to the heightened security risks that anti-Israel groups posed to religious Jewish events in the United States since the October 7, 2023 massacre in Israel.

34. For instance, in the summer of 2024, Glick had become aware of a violent protest in June 2024 organized by the national organization of the American

Muslims for Palestine–New Jersey ("AMP") and other organizations outside Adas Torah Synagogue in Los Angeles, at which protestors blew vuvuzelas and chanted "Globalize the Intifada"—a well-known call to violence against Israelis and Jews rooted in violent attacks that antisemitic terrorists have carried out against from the 1980s through the present.

35. Anticipating this risk in light of threats to Jewish worship like the vicious 2024 anti-semitic attack at the Adas Torah synagogue in Los Angeles, (https://ktla.com/news/local-news/man-charged-with-felony-hate-crime-for-attacking-jewish-man-near-l-a-synagogue/), Glick arranged private security in advance of the event he was hosting, in coordination with the Jewish Federation of Greater MetroWest NJ and the West Orange Police Department ("WOPD").

36. On or about November 4, 2024, an anti-Israel activist associated with AMP named Tova Fry, a/k/a Terry Kay ("Fry"), trespassed onto Glick's private property and personally delivered a threatening letter to Glick's home. The letter, signed by AMP and other anti-Israel organizations, demanded cancellation of the event or threatened legal action, stating in part that Glick must "immediately terminate any and all hosting, participation, support, facilitation, and conspiracy to support such events. . . ."

37. On the day Fry delivered the letter, Glick's Ring doorbell camera recorded Fry photographing Glick's home while on his property near his front door, which Glick reasonably interpreted as signaling an intent to disseminate his home address to others to facilitate further intimidation.

*Fry photographing Glick's home, captured on Glick's Ring doorbell camera:*



38. Glick relayed Fry's threatening letter to his private security team, who discovered that the Party for Socialism and Liberation–New Jersey ("PSL") and AMP were posting on social media calling for supporters to gather on November 13, 2024, near Glick's home to protest the event. The solicitation was distributed via Instagram; in a separate post, AMP urged protestors to conceal their identities with masks.

39. AMP's social media posts embedded flyers advertising a "No Business on Stolen Land" protest — sponsored jointly by PSL–New Jersey, AMP, Pal-

Awda NY/NJ, Teaneck for Palestine, and the NJ Anti-Zionist Minyan — calling for a protest near Glick's home, at "Ellis St. & Forest Ave., West Orange, NJ," Wednesday, November 13, at 6:00 PM.

40. A companion flyer notified protestors of a series of "stolen land sales" events scheduled to take place across New Jersey and New York from November 4 to 13. On the flyer, both Glick's event and a related event in Bergenfield, New Jersey, scheduled for November 7, 2024, were circled to draw protestors' attention to the events.

*AMP/PSL social media flyers advertising the November 13, 2024 protest and identifying the sponsoring organizations:*




41. On November 7, 2024, one week prior to the West Orange event, PSL, AMP, and others organized a violent protest that disrupted a Bergenfield event that

included many of the same religious activities as the West Orange gathering, foreshadowing what would occur 6 days later at Cong. Ohr Torah.

42. Following Fry's threatening letter and the Bergenfield incident, Glick's private security team advised that they could not guarantee his safety if the event proceeded at his home. The event was accordingly relocated to Congregation Ohr Torah, a synagogue a short walk from Glick's home, in coordination with WOPD, the Essex County Sheriff's Office, the private security agency, and the Jewish Federation of West Orange. Glick separately requested armed security for his home given its now-publicized address.

43. WOPD had independent advance notice of such risks and of the anti-Israel groups' interest in targeting the November 13 event.

44. On Friday, November 8, 2024, at 11:10 AM, Thomas Michaels, a former law enforcement officer and Security Chief of the Jewish Federation of Greater MetroWest NJ, emailed then-Chief of Police James Abbott about the November 13 event, requesting a meeting "to discuss preparations to ensure a safe event." Michaels warned that at the same organizer's event in Bergenfield the night before, "a large Pro-Palestinian/Hamas group descended on the location to disrupt the event," and that "agitators are actively seeking to raise awareness to their cause and disrupt the West Orange event." At 2:13 PM,

Chief Abbott replied—copying Deputy Chief Matthew Feula, Edwin Diaz, and Michael Keigher—"I'll call you."

*Email from Thomas Michaels to Chief James Abbott (November 8, 2024, 11:10 AM), and Chief Abbott's reply:*

**From:** James Abbott
**To:** Thomas Michaels
**Cc:** James P.. Abbott; edwin diaz; matthew feula; michael keigher
**Subject:** Re: WO Real Estate Event NOV 13
**Date:** Friday, November 8, 2024 2:13:13 PM
**Attachments:** image002.png
image003.png
image001.png

---

I'll call you. JPA
***James P. Abbott***
*Interim Business Administrator/Chief of Police*
*Township of West Orange*
*66 Main Street*
*West Orange, NJ 07052*
*Phone (973) 325-4030*

On Nov 8, 2024, at 11:10 AM, Michaels, Thomas <TMichaels@jfedgmw.org> wrote:

Good morning Chief

Attached is the real estate event flyer we discussed. It's being held at Congregation Ohr Torah (270 Pleasant Valley Way) on Wednesday, November 13, 2024, 1900-2100h (approx. end time). Moshe Glick, WO resident, notified me of this event and requested I help facilitate security. To that end, I am respectfully requesting a short meeting to discuss preparations to ensure a safe event.
As always, our intel analyst is monitoring internet traffic related to this event and will immediately share any actionable information.

Background:
Yesterday, the organizer, "My Israel Home", hosted the same event in Bergenfield. During the event, a large Pro-Palestinian/Hamas group descended on the location to disrupt the event (see Instagram SC). As you can see from the second IG post, agitators are actively seeking to raise awareness to their cause and disrupt the West Orange event.

45. On Saturday, November 9, 2024, at 2:17 PM, WOPD Patrol Sergeant Jeffrey Krimmel emailed fellow officers, including Lieutenant Wilfred Jiroux and

Captain Richard McDonald, to notify them that a detective from the Bergenfield police department had warned him that the same protestors who had disrupted the event in Bergenfield two nights before were planning a similar protest at the event scheduled for November 13 at Glick's home.

*<u>Email from Sgt. Jeffrey Krimmel to other WOPD officers (Nov. 9, 2024, 2:17 PM):</u>*

**From:** Jeffrey Krimmel <jkrimmel@wopd.org>
**Sent:** Saturday, November 9, 2024 2:17 PM
**To:** Kevin Dalgauer <kdalgauer@wopd.org>; Tito John <tjohn@wopd.org>; Robert O'Toole <rotoole@wopd.org>; Wilfred Jiroux <wjiroux@wopd.org>; Richard McDonald <rmcdonald@wopd.org>
**Cc:** West Orange Police Sergeants <sergeants@wopd.org>
**Subject:** Pro Hamas Rally Nov 13th

On today's date, I was contacted by Detective Estevez of the Bergenfield Police Department regarding a Pro Palestine Demonstration that is supposed to occur at a residence in West Orange on NOV 13th, 2024 (NFI). Det. Estevez stated that this information was obtained during their Debriefing.

Det. Estevez states that this protest was due to "My Israel Home" which is an organization that allegedly sells land inside GAZA. Bergenfield had a large group from both sides of situation present during their event (11/8/2024)

Det. Estevez also provided two Instagram Handles which show video from the event in Bergenfield as well as other past protests:

CeasefirenowNJ
Amp_NewJersey

A check of their website, Ceasefirenownj.org revealed an event on Nov 13th but it will occur in Teaneck as well as several future events in Montclair.

Det. Estevez
Bergenfield PD
201-387-4055

***Jeffrey Krimmel***
Patrol Sergeant
Patrol Division
West Orange Police Department

46. On Monday, November 11, 2024, at 9:58 AM, Michaels forwarded to Deputy Chief Feula a recap of the Bergenfield event, which reported that "[a]bout 60-80 pro-Pal protesters showed up" and that, although there were no arrests, "there were a few close calls." Multiple top WOPD officers thus had notice of the threat to the West Orange event days in advance.

*<u>Email from Thomas Michaels to Deputy Chief Feula forwarding the Bergenfield recap (November 11, 2024, 9:58 AM):</u>*

---------- Forwarded message ---------
From: "Michaels, Thomas" <TMichaels@jfedgmw.org>
To: Matthew Feula <mfeula@wopd.org>
Cc:
Bcc:
Date: Mon, 11 Nov 2024 14:58:09 +0000
Subject: FW: UPDATE: "My Home Israel" Real Estate Event
Chief
Here's a recap from the last real estate event held last week in Bergenfield.

Chip

**From:** Timothy Torell <TimothyT@jfnnj.org>
**Sent:** Friday, November 8, 2024 2:20 PM
[redacted]
**Subject:** UPDATE: "My Home Israel" Real Estate Event

**Please Note:** This email originated from outside of the organization. Be careful before clicking on any links or attachments.

Happy Friday all,

I just wanted to drop a quick email about last night's real estate event in my AOR since there are still four left in NJ & NY from the planned series this company is involved with…..

- The event was done at a private residence in Bergenfield in a very residential area.
- About 60-80 pro-Pal protesters showed up. Many of our local gadflies were not seen which was unusual. There was a significant amount of NY tags in the area.
- About 150 pro-Israel counter protesters showed up.
- There were no arrests, however there were a few close calls.
- Six Point Security and CSS handled security in conjunction with a significant LE presence.
- Neturei Karta was there with some of their very young children.
- Wheels of Palestine was a total no show. They did not post on SM that I could see. Also, a little unusual.
- NJcars4palestine did not show either, but they did post on their IG.
- Here's a We Transfer link to some videos from last night: https://we.tl/t-Zgpz3FbczP

Please let me know if you need anything further.

Best,
Tim

[redacted]

47. On Monday, November 11, 2024, at 10:11 AM, WOPD Lieutenant Rory Kearns emailed Captain Kevin Dalgauer, copying Captain Richard McDonald, to notify them to anticipate a large anti-Israel protest near Glick's home in West Orange on November 13. Lieutenant Kearns's email mentioned

six groups that he expected, based on a review of social media accounts, would be involved in the protest, including "PSLNewJersey," an organization that publicly praised the October 7, 2023 Hamas-led murder, rape, torture, and burning alive of over 1,000 Israelis as a "bold counter-offensive" and a "morally and legally legitimate response."

*<u>Email from Lt. Rory Kearns to Captain Kevin Dalgauer (November 11, 2024, 10:11 AM):</u>*

**From:** Rory Kearns <rkearns@wopd.org>
**Sent:** Monday, November 11, 2024 10:11 AM
**To:** Kevin Dalgauer <kdalgauer@wopd.org>
**Cc:** Richard McDonald <rmcdonald@wopd.org>
**Subject:** FW: Pro Hamas Rally Nov 13th

Captain Dalgauer,

On Saturday, 11/09/2024, Detective Estevez of the Bergenfield PD contacted this agency regarding a pro Palestine demonstration planned for Wednesday, 11/13/2024 at an unknown location in West Orange. Detective Estevez indicated that the event in Bergenfield had a large turn out from both the Israeli and Palestinian sides.

A check of multiple Instagram accounts revealed that the event is scheduled to be held on Wednesday, 11/13/2024 at 1800 hours at the intersection of Ellis Street and Forest Avenue, adjacent to Redwood School. This event was cross posted on the following Instagram accounts:

WOforHumanity
CeasefireNowNJ
NJCars4Palestine
PSLNewJersey
TeaneckforPalestine
Amp_NewJersey

I have made notification to the ROIC and attached a flyer for the event to this email.

Respectfully,

R. Kearns

48. Then, at 10:18 AM, Capt. Richard J. McDonald, Jr. emailed WOPD's Deputy Chiefs—including Dep. Chief Feula—and other WOPD supervisors, including Lt. Jiroux and Lt. Kearns, warning that "[w]ith the location of Ellis

Street and Forest being identified as a meeting spot, perhaps they are planning a march from there to 270 PVW"—the synagogue's address.

*Email from Captain Richard J. McDonald, Jr. to WOPD's Deputy Chiefs (November 11, 2024, 10:18 AM):*

**Richard McDonald** <rmcdonald@wopd.org> Mon, Nov 11, 2024, 10:18 AM

to Michael Keigher, Matthew Feula, Kevin Dalgauer, Edwin Diaz, Dennis McCole, Wilfred Jiroux, Jeffrey Krimmel, Rory Kearns

Deputy Chiefs,

Please be advised that Lt Kearns ha also located some of the Instagram pages for the pro-Palestine event this Wednesday.
With the location of Ellis Street and Forest being identified as a meeting spot, perhaps they are planning a march from there to 270 PVW.

Kearns has also notified the ROIC already.

Respectfully submitted,

49. At 10:36 AM, following a call that morning with WOPD and the Jewish Federation, Glick emailed Michaels, copying Deputy Chief Feula and Chief Abbott. Glick asked where WOPD would "allow the agitators to stand," suggested an armed guard at the synagogue's Woodland Ave entrance because "most likely the agitators will come down Woodland avenue and attempt to disrupt," and asked WOPD to confirm its plan for his home because "all of their Social Media posts have the location at our home."

*Email from Glick to Thomas Michaels and WOPD regarding safety concerns (November 11, 2024, 10:36 AM):*

**From:** Moshe Glick <mglickus@gmail.com>
**Sent:** Monday, November 11, 2024 10:36 AM
**To:** Michaels, Thomas <TMichaels@jfedgmw.org>
**Cc:** Matthew Feula <mfeula@wopd.org>; James Abbott <policechief@wopd.org>; T Kimmel <tuvia@kimmelandkimmel.com>
**Subject:** Re: Real Estate Event 270 PVW

**Please Note:** This email originated from outside of the organization. Be careful before clicking on any links or attachments.

Hi thanks again to all...appreciate the quick call this morning.

Registration has actually increased for the event inside...up to almost 30 people now.

What are your thoughts about putting one of the armed guards at Woodland Avenue entrance as most likely the agitators will come down Woodland avenue and attempt to disrupt via the Woodland Ave entrance?

Where will WO Police allow the agitators to stand?

Also please confirm plan for Nicholas Avenue (Our home) as all of their Social Media posts have the location at our home [redacted]

Please tell all the officers well have a grill going...Free hot dogs for all!

Copying Tuvia Kimmel who leads the synagogue security team.

Best regards

Dr Moshe A Glick

50. At 11:58 AM, Deputy Chief Feula responded to Glick, providing the operational notice he had "in place currently," which he said "will be updated/modified as required."

*Email from Deputy Chief Feula to Glick (November 11, 2024, 11:58 AM):*

On Mon, Nov 11, 2024 at 11:58 AM Matthew Feula <mfeula@wopd.org> wrote:

> Dr. Glick,
>
> The attached email is what I have in place currently, and will be updated/modified as required.
>
> Feel free to contact me with any questions.
>
> Thank you

51. That evening, at 6:39 PM, Glick replied to Deputy Chief Feula, copying Chief Abbott, Michaels, and senior WOPD officers including Lieutenants Jiroux and Kearns. Glick explained that the event had been moved from his home to Congregation Ohr Torah, warned that the protestors' meeting point at Ellis Street and Forest Avenue was one block from his home and a thirteen-minute walk from the synagogue, and cautioned that "the Pro Hamas crew may still believe the event is at our home and will march from their meeting point to our home." Glick asked WOPD to "please plan for this possibilty" [sic] and to identify a point person for the event.

_*Email from Glick to Deputy Chief Feula (November 11, 2024, 6:39 PM):*_

**From:** Moshe Glick <mglickus@gmail.com>
**Sent:** Monday, November 11, 2024 6:39 PM
**To:** Matthew Feula <mfeula@wopd.org>
**Cc:** Michaels, Thomas <TMichaels@jfedgmw.org>; James Abbott <policechief@wopd.org>; Michael Keigher <mkeigher@wopd.org>; Kevin Dalgauer <kdalgauer@wopd.org>; Richard McDonald <rmcdonald@wopd.org>; Wilfred Jiroux <wjiroux@wopd.org>; Rory Kearns <rkearns@wopd.org>; Edwir Diaz <ediaz@wopd.org>
**Subject:** Re: FW: Real Estate Event 270 PVW

Thanks again...we really appreciate all your help.

As discussed earlier with Chief Feula...I believe the Pro Hamas meeting point is at Ellis and Forest as this is 1 block fromour home [redacted]

The original plan was for this event to be hosted at our house. Chip has been a strong advocate of moving this to the synagogue on Pleasant Valley Way.

My concern is the Pro Hamas crew may still believe the event is at our home and will march from their meeting point to our home.

I just want to bring this to your attention and please plan for this possibility.

Their meeting point is a 13 minute walk to the synagogue nad 30 seconds to my home. Perhaps the police can block off Nicholas Ave to only local traffic?

When it is decided please let me know who will be our point person form WO Police for the event.

Thank you again for all your service

Well have a BBQ at the event...please let all the officers know hot dogs on us!

Best Regards

Moshe Glick

52. The next day, November 12, 2024, at 11:17 AM, Deputy Chief Feula wrote to Glick that WOPD was "aware of the proposed meeting place," had placed a "Directed Patrol" at Glick's residence, and that Lieutenant Wilfred Jiroux "will be the ranking officer on duty during the event and will be the point of contact."

<u>*Email from Deputy Chief Feula to Glick (November 12, 2024, 11:17 AM):*</u>

On Tue, Nov 12, 2024 at 11:17 AM Matthew Feula <mfeula@wopd.org> wrote:

> Good morning Dr. Glick,
>
> We are aware of the proposed meeting place referenced in your below email and also have a Directed Patrol in place of your residence, which will consist of frequent checks by patrol officers. Lieutenant Wilfred Jiroux will be the ranking officer on duty during the event and will be the point of contact; he will touch base with you this afternoon. As always, the non-emergency number 973 325-4000 and 911 in an emergency should be utilized to report anything suspicious or to request an immediate response.
>
> Feel free to contact me with any questions.
>
> Thank you

53. Still concerned about the potential for violent disruption, Glick wrote to Deputy Chief Feula again that afternoon, at 1:32 PM, noting that "with what happened in Teaneck and more violently in Amsterdam"—where, on November 8, 2024, assailants responding to social-media calls for a "Jew hunt" attacked Israeli soccer fans—"the Jewish community has reason to have serious concerns." Glick asked whether the protestors had a permit to assemble or march, where they would be permitted to gather, and how many officers would be present. Deputy Chief Feula answered each question in red, in-line. He confirmed that "[n]o permit was obtained," but stated that, "staying

consistent with prior events, we will not prevent a peaceful assembly and/or march." He assured Glick that "the group will not be permitted on private property nor impede the flow of vehicular/pedestrian traffic and the safety of all individuals will be paramount," and stated that, aside from private security, the Essex County Sheriff's Office would provide five deputies and WOPD would assign just two officers to 270 Pleasant Valley Way, with other WOPD officers conducting directed patrols of Glick's residence. Given the Bergenfield, Adas Torah, and Amsterdam incidents, Fry's trespass onto Glick's property and photographing of his home from his front door, and social-media posts encouraging masked protest, Glick, his private security team, the Jewish Federation, and WOPD all anticipated the potential for violence, necessitating larger police presence.

*Email from Glick to Deputy Chief Feula (November 12, 2024, 1:32 PM), with Deputy Chief Feula's in-line responses in red:*

**From:** Moshe Glick <mglickus@gmail.com>
**Sent:** Tuesday, November 12, 2024 1:32 PM
**To:** Matthew Feula <mfeula@wopd.org>
**Cc:** Michaels, Thomas <TMichaels@jfedgmw.org>; James Abbott <policechief@wopd.org>; Michael Keigher <mkeigher@wopd.org>; Kevin Dalgauer <kdalgauer@wopd.org>; Richard McDonald <rmcdonald@wopd.org>; Wilfred Jiroux <wjiroux@wopd.org>; Rory Kearns <rkearns@wopd.org>; Edwin Diaz <ediaz@wopd.org>
**Subject:** Re: FW: Real Estate Event 270 PVW

Thanks again...appreciate your help.

Obviously with what happened in Teaneck and more violently in Amsterdam the Jewish community has reason to have serious concerns.

A couple of questions;

- Does the Pro-Hamas contingent have a permit to assemble? To March? No permit was obtained, but staying consistent with prior events, we will not prevent a peaceful assembly and/or march.
- Where will the Pro-Hamas contingent be allowed to assemble if they march to the synagogue or to my home? There are factors that will need to be considered in this regard such as number of participants etc. However the group will not be permitted on private property nor impede the flow of vehicular/pedestrian traffic and the safety of all individuals will be paramount.
- How many officers will be present? Aside from the private security, I have been advised that the Essex County Sheriffs Department is providing 5 Deputies and our Department has 2 Officers assigned to 270 Pleasant Valley Way. There will also be other West Orange Officers conducting the Directed Patrols of your residence and be available in the vicinity.

54. Based on Deputy Chief Feula's assurances, Glick made no additional provisions for security for the event. Had Deputy Chief Feula instead disclosed WOPD's actual operational posture — one that would permit protestors to trespass onto synagogue property, disregard lawful police orders, and receive a police escort — Glick would have arranged additional private security to protect the congregants attending the event at Congregation Ohr Torah.

55. Jewish synagogue attendees separately spoke on scene with Lieutenant Bradley Squires, who acknowledged that WOPD was expecting far worse conduct from the Mob than what had occurred at prior events.

## II. November 13, 2024: Assembly of the Mob and the March to the Synagogue

56. On November 13, 2024, at approximately 6:00 PM, the Mob—approximately one hundred fifty pro-Hamas, anti-Israel protestors, many wearing masks to conceal their identities and carrying vuvuzelas — assembled without a permit at the intersection of Ellis Street and Forest Avenue in West Orange, a short walk from Glick's home, with the apparent goal of gathering and then descending on Glick's home.

57. Vuvuzelas are long, hard, thin horns capable of causing permanent noise-induced hearing loss and serious physical injury and are banned at many sporting events due to their potential use as weapons.

58. Vuvuzelas produce "dangerously high [noise] levels, averaging 131 decibels, A-weighted (dBA) at the horn opening," on par with a jet engine at takeoff.[1]

59. At approximately 6:50 PM, upon realizing the event had been moved from the Glick home, the Mob conversed among themselves, determined the event had been relocated to the synagogue, and marched toward Congregation Ohr Torah, passing Jewish homes, shouting at residents along the way, and accosting and harassing multiple pedestrians who were visibly Jewish from the presence of yarmulkes and other religious garb. On-Scene Police Officers present did not intervene to protect these individuals or stop the harassment.

[1] CDC NIOSH Science Bulletin, "Vuvuzelas: What's the Buzz?" (June 17, 2010), available at https://www.cdc.gov/niosh/bulletin/2010/vuvuzelas.html.

60. Despite observing the Mob's behavior, which presented a clear and present danger of violence to the Jews present, WOPD deployed an inadequate enforcement posture and allowed the Mob to approach and penetrate the immediate vicinity of Congregation Ohr Torah, providing the Mob with a de facto police escort as it advanced.

61. The Mob reached a fire station adjacent to the synagogue, where law enforcement had formed a defensive line intended to prevent the Mob from approaching the synagogue property, where worshipers had already gathered. Lieutenant Squires acted as on-scene operational supervisor; Officers Torrisi and Tutela and other On-Scene Police Officers were present as well.

62. Frightened by the approaching Mob, multiple synagogue attendees asked On-Scene Police Officers, including Squires, to instruct the Mob to move across the street or to erect barricades — to no avail. Officers asked the Mob to cross the street or at least stop at the fire station. Squires had spoken with Dragon more than once and had instructed the Mob to remain by the firehouse driveway; the Mob refused. Fry was heard on police body-camera footage asking Dragon, "Where is the entrance?" — referring to the synagogue entrance — and Dragon told her the synagogue was the next building over. One protestor declared, "We're not stopping." An officer asked the protestors to step back, telling them, "You're making me nervous." Squires himself told

the Mob, "You are intimidating me," reflecting that he had lost operational control of the event — yet he did not request backup or order the Mob to disperse.

63. Body-worn camera footage confirms that Squires was coordinating directly with Dragon, a CERT member, even though Squires believed this to be a conflict. Squires is recorded telling Dragon where the Mob should assemble, and separately telling another officer that Dragon is a CERT member.

64. Squires himself recognized the problem. On body-worn camera, Squires admitted that he had a personal relationship with Dragon and acknowledged that Dragon's dual role—a member of a Township emergency-response unit that works alongside WOPD, while simultaneously leading the Mob toward the synagogue—created a conflict of interest for the police. Yet neither Squires nor anyone else at WOPD was evidently troubled by it. Squires did not step aside, did not call for another supervisor, and did not curtail Dragon's role; instead, he continued to rely on Dragon to manage the Mob, and Dragon continued to act as the Mob's liaison—at times, as captured on body-worn camera, conducting himself as though he were law enforcement.

65. Even as the Mob massed at the firehouse and the police were plainly outmanned, an officer was released from the detail. Squires then said, "This is more than we expected." The reply was, "Really?" Squires answered,

"Yeah… we tried to deflect them so they wouldn't come down here." That was a lie — the police escorted them. Squires continued, "I'm gonna put this camera in the car and then we'll talk." He then places the camera in the car.

66. The Mob then surged through the police line, causing officers to retreat and scatter. Led by Dragon, the Mob marched onto Congregation Ohr Torah's property, shouting and blowing vuvuzelas at congregants. On-Scene Police Officers, including Squires, had previously warned the Mob that they would be arrested if they set foot on private synagogue property; members of the Mob told police they would disregard that order, and did so. Members of the Mob cursed at police and defied the order.

67. Squires's earlier warning of arrest proved to be an empty threat, as no protestor who breached synagogue property was arrested for doing so.

68. West Orange Township Code § 4-4 makes it "unlawful for any person to make, continue or cause to be made or continued . . . any excessively loud and disturbing noise which injures or endangers the health, comfort or safety of others," and specifically identifies as a violation excessive noise "adjacent to any school, institution of learning, church, court or hospital" — a category that necessarily includes synagogues — while the institution is in use. The Mob's sustained blasting of vuvuzelas and air horns directly at visibly Jewish persons, beginning during the march and continuing on synagogue property,

violated this ordinance and constituted an assault that put the Jews present in fear for their safety, as it was intended to do. Still, on-scene officers from WOPD took no enforcement action against the Mob's disruptive and intimidating conduct directed at the Jewish worshippers—including blasting drum sets, using amplification systems to shout threats at the worshippers and other intimidation tactics—and instead provided the Mob the comfort of a continued police presence.

69. At the same time, officers repeatedly ordered Glick to stop shining his small flashlight at the Mob, even as the Mob was permitted to shine a spotlight at the Jewish worshippers and continue its disruptive measures without interruption.

**III. Intimidation and Assault with Vuvuzelas on Synagogue Property**

70. As the Mob stormed the synagogue grounds, its members blew their vuvuzelas, banged drums, and used amplification to broadcast threats at the Jewish worshippers to obstruct and intimidate them and to drown out the memorial service and Torah sermon, making it impossible for worshipers to hear. Two protestors—Altaf Sharif and an unidentified female protestor ("Jane Doe")— specifically targeted Glick and other worshipers at close range with their vuvuzelas, knowing that the same is likely to cause hearing loss if

sustained. Significantly, blowing a vuvuzela to disrupt a religious service does not convey a message and is not protected speech.

71. Video of the event captured Sharif and Jane Doe targeting Glick as the event organizer by approaching within inches of Glick's face and blowing their vuvuzelas directly into his ear.

*<u>Jane Doe blowing a vuvuzela directly in Glick's ear as Glick swats it away:</u>*




72. Sharif, observing Glick swat away Jane Doe's vuvuzela, became visibly enraged and blew his own vuvuzela directly in Glick's face — so close that Glick was able to grab it and push it away as well.

*Glick grabbing and pushing away Sharif's vuvuzela:*




73. Further enraged, Sharif squared up, stared directly at Glick, and charged at him with intent to physically attack him, forcing Glick to retreat.

*Sharif charging at Glick as Glick retreats:*




**IV. Identification of Silberberg as "The Jew" and Sharif's Assault**

74. Protestor Eric Camins and worshiper David Silberberg, standing nearby, observed Sharif charging at Glick and both reacted in a manner reflecting that

they recognized Sharif's intent to harm Glick. Camins put out a hand and shook his head at Sharif in an apparent attempt to stop him, but Sharif continued toward Glick. In defense of Glick, Silberberg sprayed pepper spray into Sharif's eyes, causing Sharif to stop and cover his eyes.

75. Approximately seven seconds later, Sharif regained his vision and looked toward Silberberg. Contemporaneous video captures this sequence frame by frame: at 0:47, Sharif can be seen rubbing his eyes, with Silberberg nearby; at 0:49 and 0:50, Sharif is seen staring at Silberberg; at 0:51, Sharif turns and squints; and at 0:52, Sharif again rubs his eyes as his vision returns.

*Video still, 0:47 — Sharif rubbing his eyes, Silberberg nearby:*



*Video still, 0:49 — Sharif looking toward Silberberg:*




*Video still, 0:50 — Sharif still staring at Silberberg:*



*<u>Video still, 0:51 — Sharif turns, squints, and asks, "Who maced me?":</u>*




*<u>Video still, 0:52 — Sharif rubs his eyes again:</u>*



76. At 0:53, Camins changed his stance, pointed at Silberberg, and shouted, "The Jew is here!" — thereby identifying Silberberg to Sharif while intending that Sharif seek physical retribution against Silberberg and aiding and abetting the assault that followed.

*Camins pointing to Silberberg and shouting "The Jew is here!":*




*Video still, 0:53 — Camins pointing out Silberberg to Sharif:*



77. At 0:54, Sharif looked at Silberberg in response to Camins's identification. Less than one second later — without attempting to recover any pepper spray, without Silberberg attempting to flee, and without any further provocation from Silberberg or Glick — Sharif, motivated by antisemitic animus, seized Silberberg and placed him in a chokehold, reaching his right hand over Silberberg's left shoulder and his left hand over Silberberg's right shoulder, encircling Silberberg's neck.

*<u>Video still, 0:54 — Sharif looking at Silberberg immediately before the attack:</u>*



*Video still, 0:54 — Sharif placing Silberberg in a chokehold:*




*Sharif placing Silberberg in a neck hold:*




78. Sharif — who was a head taller and twenty years younger than the 64-year-old Silberberg — applied the full force of his body against Silberberg's neck to throw him to the ground and drilled his head into the ground on synagogue property. Sharif then dragged Silberberg down a hill on the front lawn toward the parking lot, completely flipped him over, forcing him into a 90-degree

angle, and dragging him 25 feet down a hill and onto a sidewalk. Sharif had complete control over the helpless and defenseless Silberberg.

*Sharif dragging Silberberg down the hill and driving his head into the ground:*



79. At the bottom of the hill, Sharif — without losing his grip — stood up, still holding Silberberg by the neck in a chokehold, with Silberberg bent over at a right angle, his head below Sharif's waist, and dragged him another ten to fifteen feet toward the synagogue parking lot. The Mob, including Camins and Jane Doe, followed Sharif down the hill as he continued the assault.

80. Glick and other bystanders feared for Silberberg's life, given Sharif's size advantage and the severity and ferocity of the attack. Glick, an EMT and healthcare professional, followed Sharif and Silberberg down the hill, and repeatedly calling for on-scene WOPD officers to intervene — three separate times — to no avail. Officers who were in the vicinity and in a position to intervene instead scattered. Glick attempted to physically push Sharif off of Silberberg but could not, due to Sharif's grip strength and size. Shining his flashlight on the two men, Glick saw Silberberg's leg buckling — a sign

Glick, as an EMT, recognized as a late symptom of a constricted airway — and understood that Silberberg's life was in immediate danger due to Sharif's actions.

81. One worshiper grabbed Silberberg by the waist and attempted to pry him loose from Sharif's chokehold but could not, due to the strength of Sharif's hold. With police still failing to intervene and knowing that Silberberg could die without immediate action, Glick used the small handheld flashlight he was holding to hit Sharif — intending to hit Sharif's back to force him to release his grip. Due to the movement of the Mob, the flashlight instead struck Sharif's head. Upon being struck once by Dr. Glick's flashlight, Sharif immediately released Silberberg. Dr. Glick did not continue to strike Sharif after the lone flashlight hit. Only then did WOPD officers meaningfully intervene.

82. Silberberg reported this assault by Sharif to the On-Scene Police Officers that night—telling Officer Torrisi, as captured by body-worn camera, that he had been "jumped" by a protestor—and Torrisi's report records that Silberberg told police he "began getting assaulted" and had acted to defend himself. Glick likewise reported to Squires that he had witnessed Sharif attack Silberberg. However, officers did not even perform a perfunctory

investigation and made no actual effort to investigate the complaints of Silberberg and Dr. Glick relating to the assault upon Silberberg.

83. Rather, as late as the next morning and likely already that night, WOPD, which had a conflicted relationship with the organizers of the Mob, was already treating Silberberg and Glick as perpetrators to be prosecuted.

## V. The Mob's Aftermath Conduct and False Statements to Police

84. After the assault, Sharif and Dragon falsely told WOPD officers that Silberberg had tackled Sharif — a claim directly contradicted by the video evidence described above. Law enforcement thereafter ordered the Mob off synagogue property. Around the same time, an unidentified "John Doe" protester deployed a stink bomb that further obstructed congregants' ability to worship.

85. As they were forced off the property, members of the Mob shouted at, taunted, and tried to intimidate Glick and his fellow Jewish worshipers, screaming "And you got your fucking shit rocked, didn't you?" and "You're next! You're next!" and "Moshe Glick you can't hide!".

86. The Mob's attack began even before the speeches began, interrupting the religious musical program, which included religious dancing and singing of biblical verses, and blocking access to those trying to attend. The Mob's actions, led by Dragon, caused many individuals to avoid attending the

religious event out of fear for their physical safety, and forced worshipers who did attend to relocate the remainder of their religious service to another area of the synagogue property. The unpermitted protest also obstructed the public sidewalk adjacent to the synagogue, forcing worshipers to choose between walking through the Mob or walking in the street amid heavy traffic and low visibility.

87. Immediately following the attack, Glick and others present spoke with WOPD Lieutenant Wilfred Jiroux and Lieutenant Squires on scene and described the details of Sharif's attack on Silberberg. Jiroux promised Glick and the other worshipers that WOPD would investigate.

88. However, this was an empty promise quickly uttered by WOPD and disregarded. Sharif was not arrested at the scene, and WOPD officers instead permitted him to rejoin the Mob carrying the very vuvuzela he had used to attack Glick and disrupt the event.

89. This decision to permit Sharif to reconvene with the other protestors foreshadowed WOPD's foregone conclusion, reached immediately, suspiciously reflexively, and after conducting no meaningful investigation, that he had done no wrong. By as late as the next morning, prior to interviewing any witnesses, reviewing the extensive body-worn camera footage, searching for any other camera footage that might be available, or

considering any of the other evidence readily available, WOPD had already concluded that Sharif was the victim and that Glick and Silberberg were the criminal aggressors against whom they would press charges.

90. WOPD had already decided who was to blame. Although Squires admitted on body-worn camera that he had not seen the altercation, he told Officer Tutela that Glick had cracked Sharif on the head with a flashlight—saying nothing of Sharif's chokehold assault on Silberberg—and was recorded declaring that "the doctor" was going to be locked up. Officer Torrisi, who would author the incident report, repeatedly acknowledged on body-worn camera that he did not see anything and that no officer saw what happened. Despite this admitted lack of firsthand knowledge by WOPD as to what occurred, WOPD was very firm in its almost immediate conclusion that Dr. Glick and Silberberg were at fault, and they set about framing their report accordingly and concealing exculpatory evidence.

## VI. WOPD's Investigative Framing and Concealment of Exculpatory Evidence

91. On or about November 14, 2024, WOPD Officer Vincent Torrisi drafted an "Investigation Report," which was forwarded to then-Deputy Chief Matthew Feula and to Chief James Abbott at 7:20 AM that morning. The report identified Sharif as the victim and Glick as the suspect, made no mention of WOPD's advance assurances to Glick that it was aware of the security risks

imposed by the Mob, of the Mob's earlier illegal conduct, including, but not limited to harassing Jewish residents on their way to the synagogue, intimidating worshippers from attending their synagogue, violating the noise ordinance, and disregard of police orders, Sharif's assault on Silberberg and repeated demonstrably false claims by Dragon — including that Glick had been "armed with suspected pepper spray" and had "deploy[ed] his pepper spray in the direction of the unknown victims." In short, less than 12 hours after the attack on the synagogue worshippers, WOPD had outrageously determined that the victims were the aggressors, without any meaningful investigation. Torrisi's draft report itself conceded that, although Dragon had identified Silberberg as the suspect, "officers could not collect enough evidence for same."

92. WOPD Detective Bryan Louis subsequently prepared a "Supplementary Investigation Report," of which two versions exist: an undated, unsigned draft, and a final version dated March 17, 2025, signed by both Louis and by Lieutenant Rory Kearns as reviewing supervisor.

93. It is indisputable that on January 2, 2025, Glick's criminal defense counsel provided Detective Louis with a USB drive containing exculpatory video showing (i) Sharif's assault of Silberberg and (ii) Glick's intervention, and requested that Louis forward it to ECPO, including to Assistant Prosecutor

Logan Teisch. Louis's signed report describes this footage only as showing "Silberberg approaching on the righthand side and discreetly pepper spraying [Sharif] in an attempt not to be caught," omitting any reference to the chokehold, and separately labeled the video "victim getting pepper sprayed." Louis did not forward this video to ECPO or to Teisch at that time, and — on information and belief — never did so. Tellingly, Louis had this critically important video that undercut his report before ECPO decided to arrest Glick.

94. There are material differences between the two versions of the report reflecting an attempt when editing the final version to bolster the case against Glick and Silberberg and to strengthen Sharif's claimed justification for the chokehold.

95. For example, the unsigned draft states that Sharif "observed Silberberg trying to conceal" his pepper spray; whereas Louis and Kearns changed the signed version to assert that "Silberberg was attempting to walk away and conceal" it. Whereas, the unsigned draft states that "Sharif attempted to grab the spray from Silberberg's hand"; Louis and Kearns edited the signed version to state that "Sharif grabbed Silberberg, and a physical altercation arose between the two" — omitting any reference to the chokehold Sharif in fact used in his attack on Silberberg.

96. Both the undated and the signed version also omit Sharif's own recorded verbal statement that he provided to WOPD officers in which said he admitted to being the aggressor: "I saw him holding the pepper spray, so I went to grab the pepper spray, but as soon as I went to grab it, I was attacked by the guy with the flashlight and also the guy that had the pepper spray." Both versions also omit Sharif's separate written statement claiming that Glick and others had "attempted to tackle [him] onto a sloped private property" — a version of events Sharif and Louis each subsequently abandoned in every other account they gave, after learning of the existence of the video. WOPD clearly knew from viewing the video footage of the attack and otherwise that Sharif had lied to them repeatedly and that they could not fairly rely on his account if they truly were interested in the real facts surrounding the attack; but they omitted all of that from this and every other report.

97. Louis's report further recounts a statement by Sharif attributing the incident to "Islamophobia and Arab hate" and to Glick's having targeted him because of his keffiyeh.

98. Sharif's prejudicial explanation is, of course, implausible in light of the facts that Glick never touched numerous other Mob members also wearing keffiyehs because they had not assaulted anyone, and that the video evidence

shows Glick's only physical contact with Sharif occurred while Sharif was actively strangling Silberberg.

99. The recorded interview with Sharif reflects that Louis prompted Sharif's explanation by asking him, "[D]o you think that it was because of your race[,] your beliefs[,] or . . . why do you think this incident actually happened to you," to which Sharif responded by describing "Islamophobia and Arab hate" as "the root of it."

100. Prior to Detective Louis's solicitation, Sharif never offered his religious or ethnic identity as a reason for the altercation.

101. Louis's report also recounts a statement attributed to Dragon that Glick's conduct was motivated by Sharif's keffiyeh.

102. However, Louis's report establishes that WOPD possessed and reviewed video evidence that contradicted the Sharif and Dragon accounts described above, before that report was forwarded to the Essex County Prosecutor's Office ("ECPO") on or about December 16, 2024, for consideration by its Special Victims Unit. Louis's signed report states that WOPD conducted "[a] thorough review of the body-worn cameras of the police officers who were at the protest" and, separately, "[a] check of the body-worn cameras of the police officers on the scene," each of which showed

conclusively that Glick approached Sharif not because he wore a keffiyeh but because he had put Silberberg in a life-threatening chokehold.

## VII. Charges Against Dr. Glick

103. Notwithstanding all the evidence at its officers' disposal demonstrating that Glick intervened to protect Silberberg, on January 14, 2025, WOPD charged Glick, in Complaint No. 0722-S-2025-000014, with bias intimidation, aggravated assault, and weapons offenses.

104. In a supporting affidavit dated the same day, Detective Louis swore, in relevant part: "In the course of the rally, pro-Israel counter-protesters stormed toward to Palestinian protesters and began ripping away their materials. . . . [A] physical altercation broke out between the two parties. During this altercation, another counter-protestor, defendant Moshe Glick, struck the victim on the top of his head with a black metal flashlight." This account did not mention that Sharif was actively strangling Silberberg at the moment Glick acted, and insidiously mis-characterized the Jewish worshipers who had gathered for a scheduled religious service as "counter-protesters." They had gathered for their own religious service. The protest and attack was foisted on them at their own event.

105. Louis's sworn account was not his alone. It tracked, nearly word for word, a charging narrative drafted by Defendant Teisch. On Friday, January

10, 2025, Teisch sent his proposed "Bias charges" to Defendant Montesino, copying Chief Assistant Prosecutor Roger Imhof, so that Montesino could "take a look at them and just make sure the front office had a heads up."

106. On Monday, January 13, 2025, at 10:19 AM, Teisch circulated the same narrative, under the subject line "Charge Authorization- Moshe Glick . . . David Silberberg," to more than a dozen ECPO personnel and to WOPD's Detective Louis, Lieutenant Jiroux, and another WOPD officer, copying Imhof, Montesino, and Supervising Assistant Prosecutor Kathleen Boswick. Teisch's narrative read: "On November 13, 2024, the victim, an Indian Muslim man, was participating in a pro-Palestinian rally wearing a keffiyeh in the area of 270 Pleasant Valley Way in the Township of West Orange. In the course of the rally, pro-Israel counter-protestors stormed toward the pro-Palestinian protestors and began ripping away their materials. One of the counter-protestors forcefully pulled the victim's bullhorn out of his hands. As that occurred, the victim was pepper sprayed at close range in the face, causing impaired vision, by another counter-protestor, later identified as defendant David Silberberg. The victim then attempted to grab the pepper spray from Silberberg to prevent anyone else from getting pepper sprayed. At that point, a physical altercation broke out between the two. During this altercation,

another counter-protestor, defendant Moshe Glick, struck the victim on the top of his head with a black metal flashlight."

107. Every material element of that narrative was false, and the video in WOPD's possession showed it. The Jewish worshipers did not "storm[]" anyone; they were attending a scheduled religious event on synagogue property when the Mob marched to the synagogue and invaded it. The narrative omitted that Sharif and Jane Doe had blasted vuvuzelas into Glick's face at point-blank range and that Sharif then charged at Glick. Sharif did not "attempt[] to grab the pepper spray . . . to prevent anyone else from getting pepper sprayed"; after recovering his vision, and only after Camins pointed and shouted "The Jew is here!", Sharif placed Silberberg in a chokehold, drove his head into the ground, and dragged him down a hill. And the narrative said nothing at all about the chokehold that prompted Glick to act in defense of Silberberg's life.

108. Teisch then dispensed with ECPO's own review of the charges. When Louis asked whether he still needed to send the charges to the Prosecutor's Office for review or could "send it straight as a summons," Teisch replied that "you don't need to forward them for review here. You can just go ahead and issue the summonses." Louis thanked Teisch "for all your assistance in this matter."

109. ECPO then broadcast the same false narrative to the public. On January 16, 2025, ECPO's Public Information Officer provided it, nearly verbatim, to a NorthJersey.com reporter. On February 19, 2025, the Council on American-Islamic Relations–New Jersey ("CAIR-NJ") published a press release quoting an ECPO spokesperson's statement that "pro-Israel counter-protestors allegedly stormed toward the pro-Palestinian protestors and began ripping away their materials," and urging officials to prosecute the case "to the full extent of the law as the vile hate crime that it is."

110. Detective Louis did not, at any point before charges were filed, interview available favorable witnesses or request synagogue surveillance video; the first request for such surveillance footage was not made until approximately May 2025 — roughly six months after the incident and the video was overwritten destroying the evidence. The failure by any of the investigating authorities to even request what obviously would have been vitally important video footage for some six months, knowing from any amount of experience that it likely would be overwritten by then was inexcusable if there were any intention to actually investigate and ascertain the true facts.

## VIII. Continued Prosecution Despite Exculpatory Evidence

111. On April 1, 2025, Glick's counsel, Mitchell Liebowitz, met with Assistant Prosecutor Teisch, presented the exculpatory video evidence, and provided Teisch with a copy. Teisch stated at that meeting that he had never received the USB drive that Detective Louis had been given on January 2, 2025. After the video presentation, Mr. Teisch said that he had no questions for Mr. Liebowitz, that the presentation clearly showed what really happened, and gave Mr. Liebowitz the impression that Dr. Glick was in fact innocent. Mr. Teisch stated that the criminal charges against Dr. Glick should be dismissed, and that he would be recommending dismissal to his supervisor, Deputy Chief Assistant Prosecutor Celeste Montesino.

112. Despite this, Defendant Montesino, acting out of bias against Glick, directed or approved the continued prosecution. Montesino's views were not hidden. On April 23, 2025, after the Jewish Bar Association of New Jersey wrote to ECPO about the selective prosecution of Glick and Silberberg, Montesino—who had cancelled a scheduled meeting with Glick's counsel upon receiving the letter—urged colleagues to "explore whether the defendants have any connection to this organization," adding: "It's my understanding that Dr. Glick is involved in various pro-Israel organizations." On June 13, 2025, after The Lawfare Project and others wrote to Prosecutor Stephens urging dismissal, Montesino wrote to Imhof, First Assistant

Prosecutor Alexander Albu, Supervising Assistant Prosecutor Boswick, and Teisch: “As far as I’m concerned, there’s only one victim here, and that’s Mr. Sharif.” Imhof, for his part, called the Lawfare letter “really offensive and belittling to our Office” and announced that he “will not be sending a response.”

113. Notwithstanding Mr. Liebowitz’s April 1, 2025, meeting with Mr. Teisch, ECPO continued the prosecution on felony charges. On May 28, 2025, the bias-intimidation charge was dismissed, but the aggravated-assault and weapons charges were maintained.

114. On June 6, 2025, Glick submitted complaints about the officers involved in the response to the November 13 incident to WOPD’s Internal Affairs division.

115. In mid-June 2025, the COO of The Lawfare Project wrote to Essex County Prosecutor Theodore N. Stephens II requesting dismissal of all charges against Glick. Glick’s counsel subsequently received calls from both ECPO Assistant Prosecutor Teisch and Chief Assistant Prosecutor Roger Imhof, communicating that continued advocacy of this kind could lead ECPO to withdraw a pretrial-intervention offer it earlier had put on the table, or take other adverse and/or retaliatory action. The phone call to Attorney Mitchell

Liebowitz was alluded to in an email sent from Teisch to Liebowitz stating that this was the letter his threatening call was in reference to.

116. On June 25, 2025, ECPO convened a grand jury on the remaining charges against Glick, and on July 3, 2025, Indictment No. 25-07-01562-I was returned, charging Glick with aggravated assault and weapons offenses.

117. Glick was arraigned on August 1, 2025.

118. On August 25, 2025, Glick filed a notice of tort claim against the Township of West Orange and related officials to preserve his civil claims.

119. On October 7 and October 10, 2025, Assistant Prosecutor Teisch sent Glick's counsel emails that Glick understood as intended to convey that he was being monitored and intimidated. In those communications, Teisch further attempted to intimidate Dr. Glick by referencing a media interview in which Glick was rejecting the State's offer of pretrial intervention, with an implied threat that the State would withdraw the offer.

120. On October 31, 2025, Glick's counsel formally demanded discovery from Assistant Prosecutor Teisch, including information regarding whether any other participant had been investigated. Teisch responded by email dated November 17, 2025, stating: "No one else was investigated because no one else committed a crime."

121. Notwithstanding the video evidence of his chokehold assault on Silberberg described above, and notwithstanding that Silberberg reported the assault on him by Sharif, which was documented in the police report from the evening of November 13, 2024, Sharif was never criminally charged. Neither was he charged for lying to the police nor for filing a false police report that led to the arrest of Dr. Glick.

122. Teisch nonetheless acknowledged on multiple occasions that Sharif had assaulted Silberberg, including in an email to Glick's criminal defense counsel on June 18, 2025—one week before the grand jury convened on June 25, 2025—and again in his February 2026 dismissal letter to the court described below.

123. ECPO's internal communications also reveal open contempt for Glick and those who supported him. On December 4, 2025, after Montesino circulated a news article about Jonathan Gross, a federal prosecutor, Teisch replied: "Wow...he should be ashamed of himself. But clearly is not. I can see him and Glick being good friends."

124. Other internal ECPO emails reflect the same hostility toward Glick's advocacy and his efforts to be heard: (a) on May 14, 2025, Montesino complained that Glick's attorneys were "attempting to exert pressure on us from all sides"; (b) on June 11, 2025, Teisch wrote to Sharif's counsel that,

"[u]nfortunately," there were "no legal ramifications for Glick" sharing case information with Jewish organizations, and that he had "strongly cautioned Glick's attorneys to warn him not to release any more information"; (c) on June 18, 2025, Montesino reported that ECPO was "aware of Dr. Glick's campaigning" and would "monitor the situation," while Imhof noted that Glick's supporters planned a rally at the courthouse on a State holiday—"but we aren't going to tell them"; and (d) on January 26, 2026, after Governor Murphy pardoned Glick, Prosecutor Stephens wrote internally in response to a press inquiry: "No comment! (It's good to be a Governor...)".

**IX. The Governor's Pardon and Delayed Dismissal**

125. On January 19, 2026, Governor Murphy issued (and on January 20, 2026 announced) a full, unconditional pardon to Glick with respect to all of the criminal charges described above.

126. Despite the pardon, Assistant Prosecutor Teisch adamantly announced that he intended to defy the Governor's pardon and would not move to dismiss the case against Glick. Teisch did not request dismissal until February 13, 2026 — more than three weeks later — and only after he was informed that Judge Arre would declare his continued refusal to dismiss as acting in bad faith. This delay occurred notwithstanding repeated demands from Glick's counsel in the interim that Teisch take immediate steps to terminate the

prosecution, and notwithstanding Teisch's engagement, during this period, in ex parte communications with the presiding criminal court concerning matters material to Glick's case, outside the presence of and without notice to Glick or his counsel — communications Teisch subsequently acknowledged in writing.

127. Teisch's own emails show that this refusal was pretextual. On January 22, 2026, Teisch emailed Judge Arre's law clerk that he had been "talking to Judge Arre about Moshe Glick," and that Glick's pending motion to dismiss was "all moot now, as Governor Murphy pardoned Glick on Tuesday, so his case is over and there's no need for the motion to proceed." Six days later, on January 28, 2026, Teisch wrote to Glick's criminal defense counsel: "My office has no intention of making any motions to the court for dismissal or of submitting a dismissal order to the court. I spoke with my office and with Judge Arre. My office and I are of the position that this is not our decision. It was a decision straight from the Governor's office." Teisch thus knew the case was over, yet refused to take the ministerial step of dismissing it, pretending that his hands were tied—after twice communicating with the presiding judge about Glick's case outside the presence of Glick's counsel.

128. On or about February 12, 2026, Teisch finally prepared a letter to the court recommending dismissal, which he transmitted to Judge Arre's chambers on February 13, 2026.

129. Teisch wrote, in part: "During the event, a crowd of pro-Palestinian protestors made their way to the synagogue and clashed with the congregants, who were supporting Israel. During this clash, the victim in this case, Altaf Sharif, blew his horn at close range in the direction of the defendant. The defendant then grabbed Sharif's horn and pushed it down toward the ground, away from his face. . . . [D]efendant's co-defendant, Solomon D. Silberberg . . . approached Sharif and pepper-sprayed him in the eyes. After Sharif regained his vision, he tackled Silberberg to the ground and they rolled down a hill together. Seeing this, defendant Glick felt compelled to act on behalf of Silberberg."

130. Teisch's account to the court bore no resemblance to the charging narrative he had written and circulated thirteen months earlier:

131. Who approached whom. January 13, 2025: "pro-Israel counter-protestors stormed toward the pro-Palestinian protestors and began ripping away their materials." February 2026: "a crowd of pro-Palestinian protestors made their way to the synagogue and clashed with the congregants."

132. How the encounter began. January 13, 2025: "[o]ne of the counter-protestors forcefully pulled the victim's bullhorn out of his hands." February 2026: Sharif "blew his horn at close range in the direction of the defendant," and Glick "grabbed Sharif's horn and pushed it down toward the ground, away from his face."

133. What Sharif did to Silberberg. January 13, 2025: Sharif merely "attempted to grab the pepper spray from Silberberg to prevent anyone else from getting pepper sprayed." February 2026: "After Sharif regained his vision, he tackled Silberberg to the ground and they rolled down a hill together."

134. Why Glick acted. January 13, 2025: Glick struck Sharif "[d]uring this altercation," with no reason given. February 2026: "Seeing this, defendant Glick felt compelled to act on behalf of Silberberg."

135. Nothing about the evidence changed between those two accounts. The video that refuted the January 2025 narrative was in WOPD's possession before the charges were authorized, and in Teisch's own hands no later than April 1, 2025. What changed was that Glick had been pardoned and Teisch was now writing to a judge. ECPO prosecuted Glick for more than a year on a version of events that its own prosecutor abandoned the moment the prosecution ended. Even then, Teisch's account remained sanitized: Sharif's

chokehold became a "tackle," and Sharif's dragging of Silberberg down the hill by the neck became the two men having "rolled down a hill together."

136. Teisch thus acknowledged in writing that it was the Mob—not the Jewish worshipers—that approached and confronted the congregation, and that Glick acted to protect Silberberg. Yet in November 2025, in response to a discovery demand by Glick's criminal defense counsel, Teisch had insisted that "no one else committed a crime." Shockingly, Silberberg, the victim of Sharif's vicious attack, was himself charged criminally in the matter.

137. On February 17, 2026, the criminal court entered a formal order dismissing all remaining charges against Glick, terminating the criminal proceedings in his favor.

**X. Internal Affairs Obstruction**

138. On June 6, 2025, Glick and his counsel submitted formal Internal Affairs complaints to WOPD Lieutenant William Sayers and WOPD Sergeant Sebastian DeLeon against Lieutenant Squires and Detective Louis.

139. That same day, Sayers told Glick that, upon reviewing the exculpatory video of Sharif's chokehold assault on Silberberg, he believed the matter needed to be escalated to Assistant Prosecutor Gay because WOPD officers may have engaged in criminal conduct toward Glick — yet the Internal Affairs

process remained stalled rather than escalated. Glick was never given the opportunity to provide evidence to Gay.

140. On August 1, 2025, Assistant Prosecutor George Gay of ECPO's Professional Standards Bureau ("PSB") concluded that there was insufficient evidence to warrant a criminal prosecution of the officers, but cautioned that "[t]his does not mean that there is insufficient evidence to sustain administrative charges," and directed that "[a]n independent review of the evidence should be undertaken at the administrative level, being mindful of the significantly lower burden of proof to sustain administrative charges as opposed to criminal charges." Sayers did not meaningfully advance any investigation. When Glick asked why, Sayers stated that the order to halt the investigations had come directly from "command staff."

141. On August 28, 2025—days after Glick served his Notice of Tort Claim—Sayers informed Glick that "the administrative investigation of your complaint has been suspended indefinitely and the matter is now referred to the township's legal counsel." A notice of tort claim is not litigation; indeed, a claimant may not file suit until six months after serving one. N.J.S.A. 59:8-8. Sayers separately stated that the investigations could not proceed while Silberberg's own criminal case remained pending, notwithstanding that

administrative review of officer conduct does not depend on the resolution of unrelated criminal proceedings.

142. On October 22, 2025, Glick attempted to file additional Internal Affairs complaints against former Deputy Chief Matthew Feula, Officer Torrisi, Officer Tutela, and Lieutenant Jiroux; Sayers refused to accept these complaints verbally and advised that he would only accept these complaints in writing, in blatant and intentional violation of policy.

143. On October 27, 2025, Glick's counsel, Michael Bachner, wrote to Township Attorney Richard D. Trenk explaining in detail that there was no lawful basis to suspend the investigations. Section 5.1.11 of the Attorney General's Internal Affairs Policy & Procedures ("IAPP"), on which WOPD and ECPO relied, applies only "[w]here civil litigation has been filed"; it says nothing about a complainant's pending criminal charges, and it does not reach a notice of tort claim, which is not litigation at all. Bachner asked Trenk to advise WOPD Internal Affairs to "immediately commence work on its investigation" and requested a response within five days.

144. Trenk had no answer. Twenty-four minutes after receiving Bachner's letter, at 10:15 AM on October 27, 2025, Trenk forwarded it to Essex County Prosecutor Theodore N. Stephens II, Assistant Prosecutor Gay, and PSB Director Jessica Levinson—copying Chief Abbott, Deputy Chief Feula,

Captain O'Donnell, Sergeant DeLeon, and Mayor McCartney—with a single line: "Prosecutor: See attached. Please advise. Thank you." The next day, Captain O'Donnell forwarded the letter to Gay again. Upon information and belief, Stephens forwarded the letter to others within ECPO.

145. No one at ECPO, WOPD, or the Township ever responded to Bachner's analysis or identified any legal authority for suspending the investigations. There was no response because there was no lawful basis to toll them.

146. Instead, WOPD and ECPO manufactured one. On November 14, 2025, when Glick filed additional written complaints against Squires and Louis, O'Donnell and Sayers told him that his administrative investigation was "tolled," and O'Donnell reported to Gay that afternoon that "we explained to Dr. Glick that his Administrative investigation is tolled at this time." Upon information and belief, no written tolling directive existed at that time.

147. On November 17, 2025, O'Donnell wrote to Gay: "Sir..Just checking on the status of the Toll letter you were going to send to us. Our Town attorney would like to reach out to Dr. Glick asap and provide him a copy." Gay responded: "Received and understood. We are working on it."

148. The next day, November 18, 2025, Gay issued the requested letter, directing WOPD Internal Affairs to "refrain from conducting further investigation of alleged officer misconduct related to the November 13, 2024

criminal prosecution of Dr. Glick and co-defendant until the criminal prosecution is concluded," and to "continue to take complaints from Dr. Glick, but refrain from taking a formal statement or other investigative steps." The letter rested on yet another rationale—Glick's pending criminal case—distinct from the notice-of-tort-claim and civil-litigation rationales WOPD had invoked before. O'Donnell thanked Gay: "we appreciate your assistance and guidance."

149. The IAPP does not permit an agency to shelve a complaint because the complainant might sue or is himself being prosecuted by the same office. It requires that "[a]ll allegations of officer misconduct shall be thoroughly, objectively, and promptly investigated to their logical conclusion" (IAPP § 6.0.1); warns that "[l]ong, unnecessary delays . . . can also threaten the integrity of an investigation and the trust of the community" (§ 6.1.1); contemplates that most investigations "will take no more than 45 days from the receipt of the complaint to the filing of disciplinary charges" (§ 6.1.2); requires notice to the law enforcement executive at 45-day intervals (§§ 6.1.4–6.1.5) and to the County Prosecutor when no charges are filed within 180 days (§ 6.1.6); and requires a written outcome letter to the complainant (§§ 6.2.7, 6.3.18).

150. On December 11, 2025, after Sayers reported Glick's latest visit to Internal Affairs, Gay replied: "Since this IA investigation is tolled, no further action is required at this time."

151. On December 29, 2025, Glick filed additional Internal Affairs complaints against Sayers, Captain Michael O'Donnell, and DeLeon, based on their handling of the prior complaints. Before that filing, when Glick attempted to report his complaints in person, Captain O'Donnell stood over Glick, raised his voice, and stated words to the effect of "I run this investigation," and refused to accept Glick's verbal complaint notwithstanding Glick's right to file one under the New Jersey's Internal Affairs Policies and Procedures ("IAPP"). O'Donnell sent Glick an email apologizing for this conduct the following day. Sergeant DeLeon separately told Glick that he would not be permitted to give a recorded statement.

152. Governor Murphy's January 19, 2026 pardon eliminated, as to Glick, the only basis ECPO had articulated for tolling. Yet when Glick appeared at WOPD headquarters on February 4, 2026 to request a status update, Sayers told him that WOPD had "not received any official notification regarding his case/pardon," and Gay responded only that he would "review what you have uploaded and get back to you." Even after Silberberg accepted pretrial intervention on March 2026—resolving any remaining stated basis for

delay—WOPD did not resume the investigations; it was only after repeated calls from Glick's criminal defense counsel to Gay that the investigations were permitted to resume.

153. On July 15, 2026, Glick attended an Internal Affairs interview at WOPD headquarters with counsel, in the presence of Detective Lieutenant Michael Paglucci (WOPD Internal Affairs) and Sergeant Syed Naqvi (ECPO Professional Standards Bureau). At the end of the interview, Glick and his counsel learned that WOPD's recording device had failed to record the session, requiring counsel to reconstruct it from contemporaneous notes. Detective Paglucci confirmed that any evidence of criminal conduct would be forwarded to ECPO but provided no timeline for completing the administrative investigation.

154. After repeated follow-up correspondence from Glick, on September 23, 2026, Detective Lieutenant Paglucci informed Glick that ECPO has declined to pursue any criminal charges against WOPD officers. Detective Paglucci also informed Glick that he has been given leave to resume his administrative investigation.

155. On October 7, 2026, Glick met with PSB Director Levinson regarding ECPO's decision not to charge Detective Louis criminally notwithstanding his false affidavit of probable cause and his failure to transmit the exculpatory

video, and regarding the status of his complaints. On October 12, 2026, Glick wrote to Levinson requesting the written explanation the IAPP requires. As of the filing of this action, Glick has not received an outcome letter on any of his complaints.

156. As of the filing of this action, nearly two years after the November 13, 2024 incident, WOPD's Internal Affairs investigation into the conduct of the On-Scene Police Officers and command staff remains unresolved, as does ECPO's investigation of Glick's June 24, 2026 complaint against Teisch. Glick's June 6, 2025 complaint against Louis and Squires has been pending for more than 500 days, and his October 22, 2025 complaints against Feula, Jiroux, Torrisi, and Tutela for more than a year—each far beyond the timelines the IAPP mandates.

## CLAIMS FOR RELIEF

### Count I — Fourth Amendment Malicious Prosecution (42 U.S.C. § 1983) (Against Louis, Torrisi, Tutela, Squires, Jiroux, Kearns, Feula, Abbott, John Does, Teisch and Montesino for non-advocacy conduct)

157. Plaintiff repeats and realleges each prior paragraph.

158. Defendants, acting under color of law and in bad faith, initiated and/or influenced the initiation and continuation of criminal proceedings. Such bad-faith extended to both the process and substance and included knowingly

providing false testimony and omitting exculpatory evidence, with the grand jury returning an indictment as a function of the same.

159. The prosecution ended favorably and without a conviction. Moreover, the first indictment was so fatally flawed, it was abandoned. The second indictment was fatally flawed as well.

160. The conduct of each of the defendant WOPD officers demonstrates that they lacked probable cause to initiate criminal proceedings against Glick:

- Torrisi drafted a report that materially omitted the Sharif's assault on Silberberg that precipitated Glick's intervention and omitted/failed to incorporate readily available exculpatory video, shaping a misleading probable cause presentation.
- *Silberberg reported Sharif's assault to officers on November 13, 2024, and his report was documented in Torrisi's incident report; yet Torrisi's report, and every subsequent WOPD account, cast Silberberg and Glick as the aggressors.*
- Jiroux reviewed/approved Torrisi's report and thereby ratified the misleading narrative and the incomplete investigation.
- Kearns, as reviewing supervisor, revised and signed Louis's March 17, 2025 Supplementary Investigation Report, replacing the draft's statement that Sharif "attempted to grab the spray from Silberberg's hand" with the

assertion that "Sharif grabbed Silberberg, and a physical altercation arose between the two," thereby omitting Sharif's chokehold assault on Silberberg and carrying the aggressor/victim inversion forward in the official record on which the prosecution was continued.

- Louis failed to transmit and/or fairly present exculpatory video to prosecutors, and failed to pursue neutral investigative steps, foreseeably causing baseless charges to be brought and maintained.
- Squires and Tutela provided on-scene accounts and/or investigatory input that minimized Sharif's assaultive conduct and contributed to the aggressor/victim inversion. Indeed, on the night of the event, Squires was telling other officers that Glick was guilty before any investigation had been conducted, while also admitting on body-worn camera that he did not witness anything, in an effort to influence the other officers.
- Feula's and Abbott's supervisory and policymaking decisions contributed to a post-event institutional posture of protecting the department by blaming the Plaintiff rather than pursuing the actual aggressors.
- Teisch, to the extent he was acting in an investigative/administrative evidence-handling role, continued prosecution despite awareness of exculpatory video.

- Montesino, to the extent she was acting in an investigative/administrative evidence-handling role, continued prosecution despite awareness of exculpatory video.

161. Malice/improper purpose is supported by, among other things, the deliberate omission of exculpatory facts, selective acceptance of protest-side narratives, and continuation after video review.

162. Plaintiff suffered liberty deprivation pursuant to legal process.

163. Plaintiff was charged by complaint-summons on January 14, 2025 with bias intimidation, aggravated assault, and weapons offenses; was booked, photographed for a mugshot, and fingerprinted; was indicted on July 3, 2025 on the aggravated-assault and weapons charges; was arraigned on August 1, 2025; and remained under a pending felony prosecution, required to appear in court and answer the charges, until the charges were dismissed on February 17, 2026.

164. Probable cause must be assessed charge-by-charge; tacking on unsupported charges remains actionable.

165. No such probable cause ever existed.

166. When the charges issued, Defendants knew that Silberberg had told Torrisi on body-worn camera that he had been "jumped"; that Torrisi and Squires had each admitted that no officer saw the altercation; that Sharif had

told officers he "went to grab" Silberberg's pepper spray; and that the body-worn camera footage and the video Louis received on January 2, 2025 showed Sharif strangling Silberberg when Glick acted. On those facts, no reasonable officer could have believed that Glick committed any offense rather than acting in lawful defense of another.

**Count II — Fourth Amendment Unlawful Pretrial Detention / Legal Process Without Probable Cause (42 U.S.C. § 1983) (Against Louis, Torrisi, Tutela, Squires, Jiroux, Feula, Kearns, Abbott, John Does)**

167. Plaintiff repeats and realleges each prior paragraph.

168. Defendants caused Plaintiff to be subjected to detention and/or continuing restraints after legal process issued, without probable cause.

169. The Fourth Amendment governs such claims even after legal process begins when the process is based on false evidence or lacks probable cause.

170. Process issued on Louis's January 14, 2025 affidavit, which omitted that Sharif was strangling Silberberg when Glick acted, omitted the exculpatory video Louis had held since January 2, 2025, and recast worshipers attending a religious service as "counter-protesters" who "stormed" the protestors. Had the affidavit included the omitted facts, it would not have established probable cause.

171. Plaintiff remained subject to the restraints of that process—booking, mugshot, and fingerprinting, indictment, arraignment, and a pending felony

prosecution—from January 14, 2025 until the charges were dismissed on February 17, 2026.

172. Specific causation includes Torrisi's misleading report, Jiroux's ratification, Louis's evidence suppression/delay, Kearns's revision and approval of the Supplementary Investigation Report, and Squires/Tutela's on-scene narrative input and failure to correct known inaccuracies.

**Count III — Fourteenth Amendment Fabrication of Evidence / Use of Fabricated Evidence (42 U.S.C. § 1983) (Against Louis, Kearns, Torrisi, Jiroux, Squires, John Does; Teisch and Montesino for non-advocacy conduct)**

173. Plaintiff repeats and realleges each prior paragraph.

174. Defendants knowingly created, adopted, or used materially false narratives and omissions likely to influence charging and prosecution.

175. Torrisi fabricated or effectively fabricated by omission, presenting an aggressor/victim inversion; Jiroux adopted and ratified it; Louis operationalized it by failing to transmit/present contradictory video and by building the case around the false narrative; and Kearns, with Louis, revised the Supplementary Investigation Report to omit Sharif's chokehold and recast the assault as a mutual altercation.

176. Teisch, acting in an investigative rather than an advocacy capacity and before any judicial determination of probable cause, drafted and circulated to WOPD the false charging narrative described above, which Louis then

adopted in his sworn affidavit, and dispensed with ECPO review so that WOPD could "just go ahead and issue the summonses."

177. Squires contributed by failing to document and correct the precipitating chokehold/dragging and by allowing a version of events inconsistent with observable conduct to stand.

178. Louis further shaped the record to manufacture a bias motive. He labeled the exculpatory video "victim getting pepper sprayed," and he prompted Sharif to attribute the incident to his "race" or "beliefs," then reported Sharif's answer—"Islamophobia and Arab hate"—without disclosing that he had solicited it. That solicited statement, together with Dragon's uncorroborated claim about Sharif's keffiyeh, supplied the asserted basis for the bias-intimidation charge.

179. The fabricated narrative was not inert. It was the basis for the January 14, 2025 complaint-summons, for the charges ECPO presented to the grand jury that returned Indictment No. 25-07-01562-I, and for the statements ECPO released to the press. There is a reasonable likelihood that, absent the fabricated evidence, Plaintiff would not have been criminally charged.

180. Fabrication of evidence is actionable under 1983.

## Count IV — Fourteenth Amendment Suppression of Exculpatory Evidence (Brady/Kyles) (42 U.S.C. § 1983) (Against Louis, Kearns, Torrisi, Jiroux, Squires, John Does; Teisch and Montesino for non-advocacy evidence-handling)

181. Plaintiff repeats and realleges each prior paragraph.

182. Defendants suppressed, delayed, and/or failed to disclose materially exculpatory and impeaching video evidence, causing the continuation of baseless charges.

183. Due process prohibits suppression of material exculpatory evidence.

184. Louis received the defense attorney's USB containing the accurate, exculpatory, depiction of events, and failed to transmit the complete videos and/or contextualize them fairly.

185. Torrisi, *Kearns* and Jiroux failed to incorporate known/available video and known precipitating facts into the official narrative.

186. Squires failed to ensure that core precipitating assault evidence and officer observations were preserved and disclosed.

187. Louis held the USB drive for twelve days before the January 14, 2025 charges issued and never forwarded it; Teisch confirmed on April 1, 2025 that he had never received it. The charging decision was made, and the prosecution continued for more than two months, without the one piece of evidence that showed what actually happened, until defense counsel put the video in Teisch's hands himself.

188. Both versions of Louis's report also withheld impeachment evidence that went to the heart of the case: Sharif's recorded statement that he "went to

grab" Silberberg's pepper spray, and Sharif's written claim that he had been "tackle[d]," which the video disproved and which Sharif later abandoned.

189. No Defendant requested the synagogue's surveillance video until approximately May 2025, by which time it had been overwritten and lost.

190. Teisch, to the extent he was acting in an investigative/administrative evidence-handling capacity, continued the matter despite being shown the exculpatory evidence.

191. Montesino, to the extent she was acting in an investigative/administrative evidence-handling capacity, continued the matter despite being shown the exculpatory evidence.

## Count V — Equal Protection (Selective Enforcement / Selective Treatment Based on Religion) (42 U.S.C. § 1983) (Against Feula, Abbott, Squires, Torrisi, Tutela, Jiroux, Louis, John Does; ECPO/Teisch/Montesino to the extent non-immune)

192. Plaintiff repeats and realleges each prior paragraph.

193. Defendants intentionally treated Plaintiff and similarly situated individuals differently in law-enforcement protection, investigation, and charging.

194. Discriminatory effect: protest-side aggressors (including Sharif) were not arrested/charged at the scene and were treated as credible complainants, while Plaintiff was targeted for severe charges. Sharif filed a false police report, lied to the police, assaulted Silberberg, and still was never charged.

195. The protest-side participants were similarly situated to Glick and Silberberg in every material respect: each was involved in the same encounter, on the same synagogue property, on the same evening. Sharif used far greater force than Glick—choking a 64-year-old man, driving his head into the ground, and dragging him more than 25 feet by the neck—and then lied to police about it. Camins singled Silberberg out to Sharif as "The Jew." Members of the Mob trespassed onto synagogue property in defiance of a direct police order, violated the Township noise ordinance, and shouted at the worshipers, "You're next!" and "Moshe Glick you can't hide!" None was arrested or charged. The only participants charged were the two Jewish worshipers.

196. Discriminatory purpose: Defendants' disparate treatment was motivated by religious animus and/or hostility toward Jewish religious exercise, evidenced by (a) foreknowledge of threats to a Jewish event coupled with non-enforcement posture; (b) tolerance of protest penetration onto synagogue property and a failure to protect a known intended target of religiously motivated violence; (c) reversal of aggressor/victim roles; and (d) persistence after exculpatory video review.

197. Discriminatory purpose is further shown by Defendants' own words and conduct. Louis prompted Sharif to describe the incident as the product of

"Islamophobia and Arab hate" and swore that Jewish worshipers at their own religious service were "pro-Israel counter-protesters" who had "stormed" the protestors. Officers ordered Glick to stop shining a small flashlight while permitting the Mob to train a spotlight on the worshipers. Montesino, responding to a letter from the Jewish Bar Association of New Jersey, urged colleagues to "explore whether the defendants have any connection to this organization" because Glick "is involved in various pro-Israel organizations," and later declared that "there's only one victim here, and that's Mr. Sharif." And Teisch insisted that "no one else committed a crime" while acknowledging in writing that Sharif had assaulted Silberberg.

**Count VI — Equal Protection (Class-of-One) (42 U.S.C. § 1983) (Against Louis, Squires, Feula, Abbott, Jiroux, Kearns, Torrisi, Tutela, John Does)**

198. Plaintiff repeats and realleges each prior paragraph.

199. Plaintiff was intentionally treated differently from similarly situated individuals—specifically, individuals who used force during the incident or who made false statements to police—who were not charged or were treated as complainants.

200. The comparators are concrete: Sharif, who used substantially greater force than Glick in the same encounter and was not charged; and Sharif and Dragon, who made false statements to police about that encounter and were

not charged. Each was treated as a complainant. Glick was treated as a criminal.

201. There was no rational basis for treating Plaintiff as the aggressor while declining to arrest/charge the protest-side aggressor captured in the video, and no rational basis for continuing charges after exculpatory video was provided.

202. Defendants' own admissions confirm the absence of any rational basis. Torrisi and Squires each acknowledged on body-worn camera that no officer saw the altercation, and the only objective evidence of what happened—video—showed Sharif as the aggressor and Glick as the rescuer.

203. A class-of-one claim lies where a plaintiff is intentionally treated differently from others similarly situated without a rational basis.

204. Plaintiff suffered harm as a direct and foreseeable result.

**Count VII — First Amendment Retaliation (Retaliatory Prosecution / Retaliatory Legal Process) (42 U.S.C. § 1983) (Against Louis, Squires, Feula, Abbott, Jiroux, Kearns, O'Donnell, Torrisi, Tutela, Sayers, DeLeon, John Does; ECPO/Teisch/Montesino for non-immune conduct)**

205. Plaintiff repeats and realleges each prior paragraph.

206. Plaintiff engaged in protected activity, including religious exercise and associational activity at a synagogue event.

207. Plaintiff also engaged in protected speech and petitioning activity, including publicly maintaining his innocence, enlisting community organizations to petition ECPO, filing Internal Affairs complaints, and serving

a Notice of Tort Claim. Defendants retaliated against that activity, including by continuing the prosecution while disparaging his advocacy internally, threatening to withdraw a pretrial-intervention offer because of it, and suspending his Internal Affairs complaints days after he served his Notice of Tort Claim.

208. The retaliation tracked Plaintiff's protected activity closely in time:

- After The Lawfare Project and others petitioned Prosecutor Stephens in mid-June 2025, Teisch and Imhof called Plaintiff's counsel and warned that continued advocacy could lead ECPO to withdraw its pretrial-intervention offer, and on June 25, 2025, ECPO convened a grand jury on the remaining charges.
- Montesino reported internally that ECPO was "aware of Dr. Glick's campaigning" and would "monitor the situation," and Teisch told Sharif's counsel that he had "strongly cautioned Glick's attorneys to warn him not to release any more information."
- Days after Plaintiff served his Notice of Tort Claim on August 25, 2025, Sayers suspended Plaintiff's Internal Affairs complaints "indefinitely" and referred them to the Township's legal counsel.

- In October 2025, Teisch emailed Plaintiff's counsel referencing Plaintiff's media interview, with an implied threat to withdraw the pretrial-intervention offer.
- When Plaintiff pressed his Internal Affairs complaints, Sayers refused to accept them verbally; O'Donnell and Sayers declared them "tolled" without any written directive, and O'Donnell then solicited a "Toll letter" from ECPO after the fact; O'Donnell stood over Plaintiff, raised his voice, and told him "I run this investigation"; and DeLeon told Plaintiff he would not be permitted to give a recorded statement.

209. Defendants subjected Plaintiff to adverse action, including criminal charging and continuation.

210. Plaintiff's religious exercise and association were a substantial or motivating factor in the decision to charge him, as shown by Louis's sworn characterization of worshipers at a religious service as "pro-Israel counter-protesters" and by the bias-intimidation charge built on that characterization.

211. Defendants' conduct would deter a person of ordinary firmness from exercising his rights. Being threatened with the loss of a pretrial-intervention offer for speaking publicly, and having one's misconduct complaints shelved for serving a notice of claim, are precisely the consequences that silence a citizen.

212. Plaintiff pleads absence of probable cause to bridge the causation gap in retaliatory prosecution theory.

213. To the extent Defendants characterize the claim as retaliatory arrest/charging based on probable cause, Plaintiff pleads the lack of probable cause and, alternatively, objective evidence of differential enforcement consistent with the discretionary-arrest exception principles.

**Count VIII — § 1983 Conspiracy (42 U.S.C. § 1983)**
**(Against ECPO, Township, Louis, Squires, Feula, Abbott, Jiroux, Kearns, O'Donnell, Torrisi, Tutela, Sayers, DeLeon, John Does; Teisch and Montesino for non-advocacy conduct)**

214. Plaintiff repeats and realleges each prior paragraph.

215. Defendants reached an agreement/understanding to pursue Plaintiff, in violation of his Fourth and Fourteenth Amendment rights under the U.S. Constitution and as guaranteed under New Jersey law, as the wrongdoer by coordinating narratives, withholding exculpatory video, and advancing charges unsupported by probable cause.

216. The agreement is shown by, among other things: the near-verbatim identity between Teisch's January 13, 2025 charging narrative and the affidavit Louis swore the next day; Teisch's instruction that WOPD skip ECPO review and "just go ahead and issue the summonses," for which Louis thanked him "for all your assistance in this matter"; the uniform omission of Sharif's chokehold from every WOPD and ECPO account until after the

pardon; and, as to Internal Affairs, O'Donnell's and Sayers's announcement of a "toll" on November 14, 2025, O'Donnell's request to ECPO three days later for a "Toll letter" to paper it, and ECPO's issuance of that letter the following day.

217. Overt acts include the Torrisi report; Louis report; Jiroux ratification; Louis evidence delay; WOPD/ECPO continuation of prosecution without probable cause, WOPD and ECPO conspiring to stop the Internal Affairs investigation, and more, and even after a governor's pardon; and internal-affairs obstruction to prevent accountability. These overt acts further include Teisch's January 2025 circulation to WOPD of a false charging narrative that Louis adopted under oath; O'Donnell's November 17, 2025 solicitation from ECPO of a "Toll letter" to justify a suspension WOPD had already announced; ECPO's issuance of that letter the next day; and the collective refusal of WOPD, the Township, and ECPO to respond to Plaintiff's counsel's October 27, 2025 demonstration that no lawful basis for tolling existed.

**Count IX — § 1985(3) Conspiracy to Deprive Equal Protection (42 U.S.C. § 1985(3)) (Against ECPO, Township, Louis, Squires, Feula, Abbott, Jiroux, Kearns, O'Donnell, Torrisi, Tutela, Sayers, DeLeon, John Does; Teisch and Montesino for non-advocacy conduct)**

218. Plaintiff repeats and realleges each prior paragraph.

219. Defendants conspired to deprive Plaintiff of equal protection and equal privileges and immunities.

220. The conspiracy was motivated by class-based, invidiously discriminatory animus directed at Plaintiff because he is Jewish and because the event was Jewish religious exercise.

221. That animus is reflected in Defendants' conduct and words: charging two Jewish worshipers—including with bias intimidation—for defending against an attack at their own synagogue, while charging no member of a Mob whose members singled out their target as "The Jew" and shouted "Moshe Glick you can't hide!"; Louis's solicitation of an "Islamophobia" motive and his sworn description of worshipers as "pro-Israel counter-protesters"; Montesino's inquiry into Plaintiff's "pro-Israel organizations" and her declaration that Sharif was the "only one victim"; and ECPO's public dissemination of a narrative casting Jewish worshipers as having "stormed" the protestors.

222. Plaintiff pleads state involvement and, alternatively, interference with rights protected against private encroachment as required, and pleads class-based animus consistent with limiting principles.

223. Plaintiff alleges overt acts and resulting injury, including deprivation of liberty through criminal process.

224. The overt acts in furtherance of the conspiracy include those alleged in Count VIII.

## **Count X — § 1986 Neglect to Prevent (42 U.S.C. § 1986)**
## **(Against Squires, Teisch, Montesino, Feula, Abbott, Jiroux, Kearns, O'Donnell, Sayers, DeLeon, John Does)**

225. Plaintiff repeats and realleges each prior paragraph.

226. Defendants with knowledge of the § 1985 conspiracy had power to prevent or aid in preventing it and neglected or refused to do so.

227. Each of these Defendants had actual knowledge of the wrongs and the power to stop them:

- Abbott and Feula received Torrisi's report at 7:20 AM on November 14, 2024, after receiving days of advance warnings about the Mob, and as Chief and Deputy Chief each had authority to correct the report and halt the charges.
- Jiroux promised Glick on scene that WOPD would investigate Sharif's attack, and received Teisch's January 13, 2025 charging narrative before the summonses issued.
- Kearns reviewed, revised, and signed the Supplementary Investigation Report that omitted the chokehold.
- Squires heard Glick's report of Sharif's attack on scene and knew that no officer had witnessed the altercation, yet declared that "the doctor" was going to be locked up.

- Teisch was shown the exculpatory video on April 1, 2025, stated that it clearly showed what really happened, and had the authority to dismiss the charges.
- Montesino received Teisch's recommendation of dismissal and directed or approved the continued prosecution.
- Sayers reviewed the video on June 6, 2025 and believed WOPD officers may have engaged in criminal conduct; Sayers, DeLeon, and O'Donnell controlled the Internal Affairs process; and Abbott, Feula, O'Donnell, and DeLeon received counsel's October 27, 2025 letter demonstrating that there was no lawful basis to suspend it.

228. Each neglected or refused to act, and Plaintiff's injuries followed.

229. This claim is derivative of Count IX.

**Count XI — State-Created Danger / Substantive Due Process**
**(42 U.S.C. § 1983)**
**(Against Feula, Abbott, Squires, Kearns, Torrisi, Tutela, John Does)**

230. Plaintiff repeats and realleges each prior paragraph.

231. Although the state generally has no affirmative duty to protect from private violence absent custody, the facts here support an affirmative-act theory.

232. Feula and Squires affirmatively, intentionally, maliciously, and recklessly created and increased danger by:

- adopting an operational plan that tolerated protest penetration onto synagogue private property;
- failing to establish separation corridors despite known threat intelligence;
- effectively escorting/tolerating the aggressor group's proximity;
- declining enforcement measures that would have reduced risk.
- Squires actively influencing other officers despite not witnessing the events to charge Glick

233. The Third Circuit recognizes state-created danger liability where officials' affirmative conduct increases risk of harm from private actors and conscience-shocking culpability is shown. Defendants at all relevant times knew the specific and real danger of violence this Plaintiff (and other Jews on the scene) faced from the attackers at the synagogue and failed to protect them or take objectively and subjectively necessary precautions that were available to them.

234. The harm was foreseeable and fairly direct. Defendants had days of specific warnings—from Michaels, from the Bergenfield police, from Kearns's own review of the sponsoring groups' social media, and from Glick himself—that the groups that disrupted the Bergenfield event intended to

target Glick's event. Glick was the event's organizer, and the protestors' social-media posts identified his home as their gathering point.

235. Defendants' conduct shocks the conscience. This was not a split-second decision: Feula, Abbott, and Kearns had days to plan, and Feula elected to permit an unpermitted march "consistent with prior events" and to assign just two WOPD officers to the synagogue. On scene, as the Mob massed, an officer was released from the detail; Squires put his body-worn camera in his car, declined to call for backup or order dispersal, and continued to rely on Dragon to manage the Mob; and Glick's three calls for help went unanswered while the On-Scene Police Officers, including Torrisi and Tutela, retreated and scattered.

236. Defendants affirmatively used their authority to make Glick more vulnerable. Feula's written assurances that the Mob "will not be permitted on private property" and that "the safety of all individuals will be paramount" induced Glick to forgo additional private security. Officers then escorted the Mob to the synagogue, allowed it through the police line onto synagogue property, and ordered Glick—but not the Mob—to stop using his light. Absent that conduct, the Mob would not have been on synagogue grounds, and Sharif would not have been in a position to attack Silberberg in front of Glick.

237. As a direct and foreseeable result, Plaintiff was placed in a position where he reasonably perceived the need to physically intervene to prevent serious injury or death and faced the later consequences described above.

## Count XII — Municipal Liability / Policy, Custom, Failure to Train or Supervise (42 U.S.C. § 1983) (Against Township; ECPO as applicable)

238. Plaintiff repeats and realleges each prior paragraph.

239. Municipal liability lies where an official policy/custom is the moving force behind the constitutional violations.

240. Plaintiff pleads, alternatively and in combination:

- **Policy/decision by final policymaker:** Abbott's and Feula's event operational planning and enforcement posture decisions, and Abbott's charging decisions.
- **Custom/practice:** tolerance of protest intimidation at Jewish events; aggressor/victim inversion in reports; and a pattern/practice of delaying internal affairs to avoid discipline.
- **Failure to train/supervise/discipline:** on crowd control at religious events; neutrality in investigations; handling of video evidence; Brady-aligned disclosure practices; and internal affairs processing.

241. Failure-to-train liability requires deliberate indifference and causation.

242. A pattern is typically required, but deliberate indifference may also be inferred from sufficiently pleaded practices and the obviousness of the risk; Plaintiff pleads internal affairs obstruction as evidence of deliberate indifference and ratification.

243. Abbott was the final decisionmaker for WOPD's operational planning and for the decision to charge Plaintiff, and Feula—who set the event's operational posture and is now Chief of Police—was a policymaker for that posture. Their decisions are the Township's policy.

244. The non-enforcement posture was not ad hoc. Feula told Glick in writing that, although "[n]o permit was obtained," WOPD would, "staying consistent with prior events," allow the unpermitted assembly and march to proceed—confirming a standing practice of allowing unpermitted assemblies and marches to proceed without enforcement.

245. The Township's policymakers ratified the misconduct. Abbott and Feula received Torrisi's report the morning after the event, and the charges issued on its framing; no officer has been disciplined; Sayers attributed the halt of the Internal Affairs investigations to "command staff"; and Plaintiff's complaints have now been pending for more than a year—some for more than 500 days—without an outcome letter, in violation of the IAPP's mandatory timelines.

246. As to ECPO, Montesino exercised supervisory authority over charging and disposition decisions in Plaintiff's case and directed or approved the continued prosecution after the line prosecutor recommended dismissal.

**Count XIII — NJCRA (N.J.S.A. 10:6-2)**
**(Against ECPO, Township, Louis, Squires, Feula, Abbott, Jiroux, Kearns, O'Donnell, Torrisi, Tutela, Sayers, DeLeon, John Does; Teisch and Montesino for non-advocacy conduct)**

247. Plaintiff repeats and realleges each prior paragraph.

248. Defendants deprived Plaintiff of substantive rights secured by the New Jersey Constitution and laws, including freedom from discriminatory law enforcement and deprivation of liberty without lawful basis. N.J.S.A. 10:6-1 to -2.

249. The rights at issue include those secured by Article I, Paragraph 1 (due process and equal protection), Paragraph 3 (free exercise of religion), Paragraph 5 (freedom from discrimination in the exercise of civil rights because of religious principles), Paragraph 6 (freedom of speech), Paragraph 7 (freedom from unreasonable seizure), and Paragraph 18 (assembly and petition) of the New Jersey Constitution. The conduct alleged in Counts I through XI deprived Plaintiff of each of those rights.

250. Defendants also interfered with those rights by threats, intimidation, and coercion, including the threats to withdraw Plaintiff's pretrial-intervention offer in response to his advocacy and O'Donnell's confrontation

of Plaintiff when he sought to file Internal Affairs complaints. N.J.S.A. 10:6-2(c).

251. NJCRA is construed as a broad remedial statute; and procedural requirements like Tort Claims Act notice are not automatically imported into NJCRA causes of action.

**Count XIV — NJLAD (Religion Discrimination / Hostile Public Accommodation / Interference)**
**(Against Township, Louis, Squires, Feula, Abbott, Jiroux, Kearns, Torrisi, Tutela, John Does)**

252. Plaintiff repeats and realleges each prior paragraph.

253. Defendants, through discriminatory policing and differential enforcement at a Jewish religious gathering, denied Plaintiff the full and equal enjoyment of protections and services without discrimination based on religion, and aided/abetted such discrimination. N.J.S.A. 10:5-1 to -50.

254. The police services the Township provides to the public through WOPD are a public accommodation within the meaning of N.J.S.A. 10:5-5(l).

255. Defendants denied Plaintiff and his fellow Jewish worshipers the protection WOPD promised and provides to others. After assuring Plaintiff in writing that the Mob "will not be permitted on private property," officers escorted the Mob to the synagogue, permitted it onto synagogue grounds, ignored Plaintiff's three calls for help while a congregant was being strangled, and ordered Plaintiff to stop using his flashlight while permitting the Mob to

use a spotlight. Defendants then treated the Jewish victims as criminals—charging Plaintiff with a bias crime—while treating the protest-side aggressor as the victim.

256. The Township's conduct violated N.J.S.A. 10:5-12(f). Each individual Defendant knowingly and substantially assisted that discrimination and is liable as an aider and abettor under N.J.S.A. 10:5-12(e).

**Count XV — Malicious Prosecution (New Jersey Common Law) (Against Louis, Squires, Feula, Abbott, Jiroux, Kearns, Torrisi, Tutela, John Does; Teisch and Montesino for non-advocacy conduct)**

257. Plaintiff repeats and realleges each prior paragraph.

258. Defendants instituted or procured criminal proceedings against Plaintiff without probable cause and with malice; proceedings terminated favorably; and Plaintiff suffered resulting harms.

259. Louis instituted the proceedings by swearing the January 14, 2025 affidavit and issuing the complaint-summons; Teisch drafted the narrative Louis adopted and dispensed with ECPO review; Torrisi's report, approved by Jiroux, and the Supplementary Investigation Report, revised and signed by Louis and Kearns, supplied the false foundation; Squires declared on the night of the event that "the doctor" was going to be locked up; Abbott, as final decisionmaker, approved the decision to charge; Feula and Tutela contributed

as alleged in Count I; and Montesino directed or approved continuation after the line prosecutor recommended dismissal.

260. New Jersey recognizes the tort elements for malicious prosecution/malicious use of process.

261. Probable cause is a complete defense; Plaintiff pleads the absence of probable cause in light of the video and defense-of-others facts.

262. Malice may be inferred from the absence of probable cause, and it is independently shown by the deliberate omission of the chokehold from every official account, the solicitation of a bias motive from Sharif, and Montesino's declaration that Sharif was the "only one victim."

263. The proceedings terminated in Plaintiff's favor on February 17, 2026. Before that dismissal, Teisch conceded to the court in writing that it was the protestors who "made their way to the synagogue and clashed with the congregants," and that Plaintiff acted because he "felt compelled to act on behalf of Silberberg." The termination reflects Plaintiff's innocence, not a compromise.

**Count XVI — Abuse of Process (New Jersey Common Law) (Against Louis, Squires, Feula, Abbott, Jiroux, Kearns, Torrisi, Tutela, John Does; Teisch and Montesino to the extent not immune under applicable doctrine)**

264. Plaintiff repeats and realleges each prior paragraph.

265. After process issued, Defendants misused the criminal process for an ulterior purpose, including to justify WOPD operational failures, to appease the protest-side aggressors, and to deter Plaintiff and other Jewish participants from protected religious activity.

266. Plaintiff pleads post-issuance misuse, including continuation after exculpatory video presentation and delay in dismissal following pardon.

267. After process issued, Defendants used the pending charges as leverage for purposes the process was never meant to serve. Teisch and Imhof warned Plaintiff's counsel that continued public advocacy could cost Plaintiff his pretrial-intervention offer; Teisch invoked Plaintiff's media interview with an implied threat to withdraw the offer; Teisch "strongly cautioned" counsel to warn Plaintiff "not to release any more information"; and the pending prosecution was invoked as the stated basis for "tolling" Plaintiff's Internal Affairs complaints against the very officers who brought the charges.

268. After the Governor's January 19, 2026 pardon, Teisch refused for more than three weeks to take the ministerial step of dismissing the charges—while privately acknowledging that the case was "all moot now"—and requested dismissal only after he was informed that the court would declare his continued refusal to be bad faith.

**Count XVII — Civil Conspiracy (New Jersey Common Law)**
**(Against Louis, Squires, Feula, Abbott, Jiroux, Kearns, O'Donnell, Torrisi,**

**Tutela, Sayers, DeLeon, John Does; Teisch and Montesino for non-advocacy conduct)**

269. Plaintiff repeats and realleges each prior paragraph.

270. Defendants agreed to accomplish an unlawful purpose (wrongful prosecution and discriminatory enforcement) or a lawful purpose by unlawful means (false statements, suppression of evidence, and intimidation), and committed overt acts causing damages.

271. The agreement and overt acts are those alleged in Counts VIII and IX, including the coordination between Teisch and Louis on the charging narrative and summonses, the omission of Sharif's chokehold from every official account, the threats against Plaintiff's pretrial-intervention offer, and the coordinated after-the-fact "tolling" of Plaintiff's Internal Affairs complaints. Plaintiff was damaged as a result, including through the cost of defending the criminal charges and the harms alleged above.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in his favor and against defendants, and grant the following relief:

A. Compensatory damages against all defendants in an amount to be determined at trial for emotional distress, damage to reputation, legal fees incurred in defending against criminal charges, and other damages resulting from the wrongful prosecution.

B. Punitive damages against all defendants in an amount to be determined at trial for their willful, malicious, and reckless disregard for Dr. Glick's constitutional and civil rights and their actions and inaction in derogation of his clearly established rights.

C. Declaratory relief pursuant to 28 USC § 2201 declaring that the defendants' actions violated Dr. Glick's constitutional and civil rights under federal and state law.

D. Injunctive relief requiring the Essex County Prosecutor's Office and the Township of West Orange, including the West Orange Police Department, to implement policies, procedures, and training to prevent religious and political discrimination in law enforcement and prosecution decisions.

E. Attorney's fees and costs pursuant to 42 USC § 1988 and other applicable laws.

F. Such other relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Solomon M. Radner*
Solomon M. Radner (ID No. 283502018)
RADNER LAW GROUP, PLLC
17000 West Ten Mile Road, Suite 250
Southfield, MI 48075
T: (877) 723-6375 | F: (866) 571-1020
solomon@radnerlawgroup.com

*/s/ Jeremy M. Doberman*
Jeremy M. Doberman (ID No. 089572013)
TAYLOR DYKEMA PLLC
28 Wootton Road
Essex Fells, NJ 07021
(713) 299-6404
Jeremy@taylordykema.com

*David I. Schoen
David I. Schoen (*pro hac vice* application intended)
SCHOEN LAW FIRM, LLC
2800 Zelda Road, Suite 100-6
Montgomery, AL 36106
T: (917) 941-7952 | F: (917) 591-7586
schoenlawfirm@gmail.com

*Simon J. Schoen
Simon J. Schoen (*pro hac vice* application intended)
SCHOEN LAW FIRM, LLC
3151 Maple Drive NE
Atlanta, GA 30305-2545
T: (404) 368-9139 | F: (917) 591-7586
simon@schoenlawfirm.com

*Attorneys for Plaintiff Dr. Moshe Glick*

Dated: November 10, 2026

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, the matter in controversy is related to the following actions: *United States v. Party for Socialism and Liberation New Jersey, et al.*, No. 2:25-cv-16049-KSH-JRA (D.N.J.) (FACE Act action arising from the November 13, 2024 events at Congregation Ohr Torah); *Glick v. Stephens, et al.*, No. 2:25-cv-16268-SDW-AME (D.N.J.); and *Glick v. Essex County Prosecutor's Office, et al.*, No. ESX-L-003024-26 (N.J. Super. Ct. Law Div.) (OPRA action). Other than the foregoing actions and the Internal Affairs complaints described in this Complaint, the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

*/s/ Solomon M. Radner*
Solomon M. Radner, Esq.

Dated: November 10, 2026